**ILLINOIS COUNCIL ON LONG TERM CARE, (a not-for-profit corporation) and member facilities, Plaintiffs,**

v.

**Jeffrey MILLER, Director of the Illinois Department of Public Aid, and Margaret M. Heckler, Secretary of the Department of Health and Human Services, Defendants.**

**ILLINOIS HEALTH CARE ASSOCIATION, a not-for-profit organization, Plaintiffs,**

v.

**Jeffrey MILLER, Director of the Illinois Department of Public Aid and Margaret M. Heckler, Secretary of the Department of Health and Human Services, Defendants.**

Nos. 83 C 4812, 83 C 5245.

United States District Court, N.D. Illinois, E.D.

Sept. 7, 1983.

Howard L. Stone, John W. Cooley, Stone, McGuire & Benjamin, James J. Casey, Keck, Mahin & Cate, Chicago, Ill., for plaintiffs.

Thomas P. Walsh, Asst. U.S. Atty., James C. O'Connell, Sp. Asst. Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Before the court are two motions for preliminary injunction. Because of the related nature of the cases and the desire on the parts of the court and the parties to reach a swift decision, the court has consolidated the actions for the purpose of these motions.

## I. FACTS

Plaintiff Illinois Council on Long Term Care ("Council") is a not-for-profit corporation representing a number of nursing homes receiving Medicaid payments. Joined as plaintiffs with Council are Council's member organizations. Plaintiff Illinois Health Care Association ("IHCA") is also a not-for-profit organization representing a number of nursing homes receiving Medicaid payments. Defendant Miller is Director of the Illinois Department of Public Aid ("DPA"). Defendant Heckler is the Secretary of the United States Department of Health and Human Services ("DHHS"). Plaintiffs are concerned about the effects of Illinois Public Act 83–17 on Medicaid payments to be received by their member nursing facilities.

■■■ Title XIX of the Social Security Act ("Act"), entitled "Grants to States for Medical Assistance Programs," and commonly called Medicaid, provides for the establishment of cooperative federal-state medical and health programs for those with insufficient income to meet their medical expenses. *See* 42 U.S.C.A. § 1396 *et seq.* State participation in the Medicaid program is optional, but once a state agrees to participate it must comply with federal statutory requirements. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). States that choose to participate are eligible to receive matching funds if the state establishes a reimbursement schedule that satisfies statutory and regulatory requirements embodied in the Act and the regulations promulgated there-

under. *See Charleston Memorial Hospital v. Conrad,* 693 F.2d 324, 326 (4th Cir. 1983). Nursing home care is covered under Medicaid. 42 U.S.C.A. § 1396a(a)(13)(A).

■■■ In order to participate in Medicaid a state must determine the rates at which it will reimburse those organizations which dispense medical care to the needy covered by the Act. These state plans must include rates

... which the State finds, and makes assurance satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards....

42 U.S.C.A. § 1396a. States are given wide discretion in the administration of local programs, *Dawson v. Myers,* 622 F.2d 1304, 1307 (9th Cir.1980), *vacated on other grounds,* 451 U.S. 625, 101 S.Ct. 1961, 68 L.Ed.2d 495 (1981); *Unicare Health Facilities, Inc. v. Miller,* 481 F.Supp. 496, 498 (N.D.Ill.1980), and State plans must be approved by the Secretary of DHHS if they meet the Act's requirements. Once approved, they are subject to scrutiny by the Secretary to ensure continued compliance. *See Charleston Memorial Hospital v. Conrad,* 693 F.2d at 327. The state can amend its plan as long as the plan, as amended, satisfies federal requirements. *See generally* 45 C.F.R. § 201.3 (1982).

Illinois elected to participate in Medicaid and submitted its state plan, as required, to the Secretary for approval. Included in this plan is a reimbursement schedule for medical services provided by nursing homes. The reimbursement rate for these services consists of three distinct and independently calculated components: the support component, the capital component and the nursing component. The sum of the three components constitutes a facility's reimbursement rate. Rates are expressed as the amount received per patient per day.

The nursing component of the reimbursement rate is relevant to IHCA's motion and

will be discussed briefly. Among the elements making up the nursing component are two reimbursements for time spent with the patient. The variable time reimbursement is reimbursement for that time spent with patients which varies according to individual needs. The fixed time reimbursement was created to encompass that time spent "which does not vary with resident condition or which cannot be measured by an assessment tool." Illinois State Medicaid Plan Attachment 4.19–D, at p. 8. Fixed time is not measured but is calculated by subtracting the mean variable time for each patient from the Department of Public Health's minimum staffing requirements for single patients, plus 5%. This minimum staffing requirement is a measured value of average hourly nursing care required by nursing home patients. The fixed time figure is then added to the variable figure to determine the time element for the nursing component allotted for each patient. *Id.* at 8–9. Reimbursement for this time, plus reimbursements for fringe benefits and supplies, make up the nursing component. The determination of these rates occurs annually.

The Illinois plan provides for general reimbursement rates to be based on annual cost reports. There is necessarily a lag between the data coming in and the DPA's assessment of reimbursement rate levels. Accordingly, the plan provides for cost of living increases in the reimbursement rate levels. *See* Illinois State Medicaid Plan Attachment 4.19–D, at pp. 4–5. The Illinois plan has been accepted by the Secretary.

On July 1, 1983, the Illinois state legislature passed Public Act 83–17, which affected the state's reimbursement plan for its Medicaid programs. The Act delayed any rate or inflationary increases until July 1, 1984. Passage of the Act saved the state a considerable amount of money—over 35 million dollars. The DPA submitted this change to the Secretary as an amendment to the state Medicaid plan on July 14, 1983. The effective date of the amendment was July 1, 1983. Also submitted were required information and assurances that the plan, as amended, is "reasonable and adequate to meet the costs that must be in-

curred by efficiently and economically operated facilities to provide services in conformity with applicable State and Federal laws, regulations, quality and safety standards." (Defendants' Memo. in Opp., Ex. B, at p. 4.)

Plaintiff Council and its member organizations seek to preliminarily enjoin Public Act 83–17, relying upon the first four counts of their amended complaint, which were the four counts of their original complaint. Those counts allege (1) that the proposed amendment cannot be implemented until actually approved by the Secretary, (2) that the proposed amendment is in violation of the Act because it is solely based on budgetary considerations, (3) that Public Act 83–17 deprives Council's member facilities of constitutionally protected property interests created directly through their contracts with the state and indirectly as third party beneficiaries of the contract between the federal government and the state; and (4) that Public Act 83–17 interferes with contract rights secured by the Contract Clause of the United States Constitution. Plaintiff IHCA joined in this motion.

On August 12, 1983, the DPA notified nursing homes receiving Medicaid of its new fixed time rate. The DPA stated in its letter that variable time had exceeded the Department of Public Health's minimum staffing requirements plus 5%. Fixed time, therefore, would be negative and subtracted from variable time for each patient to determine reimbursable nursing time.

Plaintiff IHCA seeks to preliminarily enjoin application of the newly calculated negative fixed time rate as violative of Public Act 83–17. Plaintiff Council joins in this motion and has amended its complaint to add claims relating to the negative fixed time rate.

## II. LEGAL STANDARD

In granting or denying a request for a preliminary injunction this court must examine four factors: (1) whether the plaintiff has at least a reasonable likelihood of success on the merits; (2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the

injunction does not issue; (3) whether the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendant; and (4) whether the granting of a preliminary injunction will disserve the public interest. *Martin v. Helstad,* 699 F.2d 387, 389 (7th Cir.1983); *Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 613 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). None of these factors is decisive, but likelihood of success on the merits is often considered a threshold requirement for the granting of preliminary relief. *Reinders Brothers, Inc. v. Rain Bird Eastern Sales Corp.,* 627 F.2d 44, 49 (7th Cir.1980). *See Kolz v. Board of Education,* 576 F.2d 747, 749 (7th Cir.1978) (stating if a court finds no probability of success on the merits and no irreparable injury, it is unnecessary to consider other factors).

◼ This court is mindful that the grant of a preliminary injunction "is the exercise of an extremely far-reaching power not to be indulged in except in a case clearly warranting it." *Fox Valley Harvestore v. A.O. Smith Harvestore Products, Inc.,* 545 F.2d 1096, 1097 (7th Cir.1976). Because of the extraordinary nature of the remedy, the burden of persuasion is on the plaintiff as to all the prerequisites for the exercise of this power. *Id.* Plaintiff IHCA's claim is dependent upon Council's claim and, therefore, Council's claim will be decided first.

### III. PLAINTIFF COUNCIL'S LIKELIHOOD OF SUCCESS ON THE MERITS.

At the outset, the court recognizes the effect Public Act 83–17 can have on Medicaid reimbursements paid to provider nursing homes. Yearly rate and inflationary increases were an integral part of the state's original Medicaid plan. That plan, with the increases, was accepted by the Secretary as being within federal standards. Delaying the rate and inflationary

increases significantly changes the state plan and reduces the real level of reimbursements paid to providers. If the prior plan only minimally reached the threshold of federal acceptability, it requires no great insight to conclude that a significant reduction from the minimally acceptable results in unacceptability. Conversely, a plan which clearly met federal standards and is then restricted may still conform to those standards.

◼ Plaintiff Council asks this court at this time to determine whether the plan as amended conforms to the federal standards. The standards require that the amended plan be "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities." 42 U.S.C.A. § 1396a(a)(13)(A). The determination of whether the plan conforms to these standards is, in the first instance, properly made by the Secretary. The doctrine of primary jurisdiction counsels this court to await the Secretary's determination of the reasonableness and adequacy of the amended plan. *See generally Hansen v. Norfolk and Western Railway Co.,* 689 F.2d 707, 709–11 (7th Cir. 1982). The doctrine, "concerned with promoting proper relationships between courts and administrative agencies," *Bradford School Bus Transit, Inc. v. Chicago Transit Authority,* 537 F.2d 943, 949 (7th Cir. 1976), *cert. denied,* 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977), is especially applicable to the present case where the question involved concerns a reasonableness standard and turns on technical issues outside the conventional competence of the courts. *See Nader v. Allegheny Airlines,* 426 U.S. 290, 305, 96 S.Ct. 1978, 1987, 48 L.Ed.2d 643 (1976). In addition, plaintiff has not provided this court with information and the technical data this court would require to make such a decision. *See Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 463 (E.D. Mich.,1982). The court, therefore, declines to determine whether the plan as amended conforms with federal standards.[1]

---

1. In *Wisconsin Hospital Association v. Linda Reivitz,* No. 82 C 1055, CCH Medicare & Medicaid Guide, ¶ 32,380 (E.D.Wis. Jan. 11, 1983), the

court found a rate freeze unreasonable and therefore in violation of federal standards. In

The plan as amended has been submitted to the Secretary along with assurances that the new reimbursement level meets the applicable federal standards Plaintiff Council has also submitted preliminary objections to the proposed plan amendments to the Secretary for her consideration. The court expects that the Secretary will carefully consider the impact of Public Act 83–17 on the adequacy of reimbursements to be received by provider nursing homes and, after considering relevant data on all aspects of required nursing home costs, determine whether the amended plan conforms to the federal standards. After the Secretary's determination judicial review of her decision would be appropriate. *See Hempstead General Hospital v. Whalen,* 474 F.Supp. 398, 406 (E.D.N.Y.1979), *aff'd* 622 F.2d 573 (2d Cir.1980); *Hospital Association of New York State, Inc. v. Toia,* 438 F.Supp. 866, 868–69 (S.D.N.Y.1977). *See also Alabama Hospital Association v. Beasley,* 702 F.2d 955 (11th Cir.1983) (reviewing methodology behind and result of Secretary's acceptance of state's Medicaid plan). At the same time, it should be noted that judicial review of agency action will be impacted by the nature of that action. If the plan change is "deemed accepted" by the Secretary's inaction this court will be compelled to decide whether the plan meets federal standards without the benefit of, and review restrictions resulting from, her analysis.

Since the court declines to determine whether the plan, as amended, conforms to federal standards, plaintiff can only prevail on the basis of its procedural objection to the time of implementation of the plan amendments, its argument concerning the impropriety of the legislative basis to Public Act 83–17, and its constitutional claims. These issues will now be examined.

### A. Defendant's implementation of the amendment before receiving the Secretary's approval.

Plaintiff contends in count I of its complaint that the state may not lawfully implement a significant change in its long-term care reimbursement methods until the state has submitted a plan amendment, assurances, and related information to the Secretary, and those documents have been actually accepted or deemed accepted by the Secretary. Plaintiff bases its contention on the language in 42 C.F.R. § 447.-256(b) (1982), which deals with the effective dates of significant changes in Medicaid reimbursement methods, the plans and assurances for which have been delivered to the Secretary.[2] That section provides as follows:

(b) *Effective date.* (1) Except as specified in paragraph (b)(2) of this section, a proposed payment rate with respect to which [DHHS] has accepted assurances or with respect to which an assurance has been deemed accepted under this section will be effective on the date specified in the agency's assurances.

---

that case, however, no amended plan had been sent to the Secretary and no assurances made before implementation. "Thus, while the State has made Assurances to the federal government that its reimbursement plan takes inflationary increases into account, it nevertheless refuses to grant these inflationary increases provided for in the State Plan until the fourth month of a hospital's fiscal year." *Id.* In the present case assurances have been sent. Implementation, therefore, is proper under 42 U.S.C.A. § 1397a(a)(13)(A) and this court finds no need to follow the Wisconsin court's lead and determine the reasonableness of the state's plan under the Act.

**2.** Plaintiff also claims that *California Hospital Association v. Schweiker,* 559 F.Supp. 110 (C.D. Cal.1982) supports its claim. In that case the court held that the State Department of Human Services had not satisfied federal regulations in the findings and assurances it sent to the Secretary to defend a 6% cap on hospital reimbursement increases. The court enjoined the cap until proper findings were made by the state agency and the plan received approval by the Secretary. *Id.* at 117. The reason the court demanded the Secretary's approval was not made clear. The court possibly wanted federal approval for the 6% cap to ensure that the state agency's findings and assurances had fully satisfied federal regulations. Whatever the court's reasons, it did not explain its demand for Secretary approval before the plan's implementation, nor did it discuss relevant authorities for that position. This court, therefore, does not feel bound by the decision.

(2) A payment rate with respect to which [DHHS] has accepted assurances or with respect to which an assurance has been deemed accepted under this section will not be effective for any period beginning before the first day of the calendar quarter in which the agency submits the assurances and related information described in § 447.225.

Plaintiff claims that § 447.256(b) deals with only the effective dates of payment rates that have *already* been accepted, or deemed to have been accepted, by the Secretary. Plaintiff's reading of the section assumes that where § 447.256(b)(2) refers to a plan becoming effective on the first day of the quarter in which assurances and related information were delivered, the statute is implying a retroactive application implemented only upon acceptance by the Secretary. In light of the language and history of the Medicaid statute, current case law, and the construction of the provision by the federal agency involved, this provision cannot bear the plaintiff's interpretation.[3]

The federal statutory provision governing this area is 42 U.S.C.A. § 1396a, which states, in relevant part, that the state must:

(13) provide—

(A) for payment ... [to the facility providing Medicaid services] which the state finds and makes assurances satisfactory to the Secretary, are reasonable and adequate....

42 U.S.C.A. § 1396a(a)(13)(A). This statute, while not clearly allowing implementation before acceptance, is clarified when contrasted with the relevant statutory provision before the 1981 amendments. That statute read, in relevant part, that the state must provide for payment of reasonable Medicaid costs:

as determined in accordance with methods and standards ... which shall be developed by the State and reviewed and approved by the Secretary and (after no-

tice of approval by the Secretary) included in the plan....

42 U.S.C.A. § 1396a(a)(13)(D) (1974).

When the explicit language requiring acceptance before approval in the earlier statute is contrasted with the later statute, Congress' intent in deleting the earlier language becomes clear. In *Magee-Womens Hospital v. Heckler*, 562 F.Supp. 483 (W.D. Pa.1983), Judge Weber wrote concerning these two statutes:

In the instant case Congress had previously imposed a prior approval requirement by the inclusion of simple explicit direction in the statute. This direction is absent in the 1981 amendment, though its inclusion would have been a simple matter for Congress. We conclude that the deletion of the prior approval requirement is persuasive evidence that Congress intended to change the meaning of the statute.

*Id.* at 485. The purpose of 42 C.F.R. § 447.256(a) is to implement 42 U.S.C.A. § 1396a(a)(13)(A). 42 C.F.R. § 447.250 (1982). The language within the regulations mirrors the change in the statute. *Compare* 42 C.F.R. § 557.250 (1982) (repeating relevant language of § 1396a(a)(13)(A)), *with* 42 C.F.R. § 447.261(a) (1980) (requiring approval of Regional Medical Director before implementation of methods and standards for determining reasonable in-patient costs). These regulations, therefore must be interpreted in light of the statutory changes in their governing statutes.

The evolution of statutory language is relevant in construing ambiguities within the statute. *Magee-Womens Hospital v. Heckler*, 562 F.Supp. at 495; *Hickman v. Western Heating and Air-Conditioning Co.*, 207 F.Supp. 832, 834 (N.D.Ind.1962). The evolution of the language in 42 U.S.C.A. § 1396a, and that evolution as mirrored in 42 C.F.R. § 447, strongly indicates that implementation of proposed amend-

---

**3.** As plaintiff correctly notes, 45 C.F.R. § 201.-3(g), relied on by defendants, is not controlling with respect to amendments which make changes in already existing disbursement pro-

grams. It does, however, provide analogous support for the court's finding by indicating a willingness to allow implementation of programs without prior approval.

ments to Medicaid reimbursement plans pending acceptance is proper under Title XIX.

■ Further support for this conclusion comes from the Department of Health and Human Services, defendant in this action. In a statement filed with this court the federal defendant wrote: "[I]t is the position of Defendant HHS that the Medicaid statute should be construed so as to allow states the flexibility to implement Medicaid State Plan amendments prior to Federal approval." (Fed. Def's Statement of Position, at 1.) It is well-settled that great deference should be accorded the construction of a statute by the agency required to execute it, and that the agency's construction "should be followed unless there are compelling indications that it is wrong...." *Red Lion Broadcasting Co. v. Federal Communications Commission*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371 (1969); *McElrath v. Califano*, 615 F.2d 434, 439 (7th Cir.1980). This court finds no such compelling indications that the agency is wrong. In fact, there are strong indications that the agency has correctly construed the statute. *See Charleston Memorial Hospital v. Conrad*, 693 F.2d 324, 332–33 (4th Cir.1982); *Magee-Women's Hospital v. Heckler*, 562 F.Supp. at 486.

■ This court holds, therefore, that implementation of the state's amendment to its reimbursement plan before acceptance by the Secretary was not in violation of federal law.

B. *Defendant's improper motives in enacting Public Act 83–17.*

Plaintiff Council also contends that Public Act 83–17 violates the provision in 42 U.S.C.A. § 1396a(a)(13)(A) which requires payments to be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." This court has already declined to determine whether amendments to the state Medicaid plan effectuating Public Act 83–17 violate this standard. Plaintiff argues, however, that Public Act 83–17 was enacted solely for budgetary reasons. Plaintiff claims that a state Medicaid plan,

or an amendment to that plan, which was enacted for solely budgetary reasons is in violation of the Act. Plaintiff relies on legislative history for § 1396a(a)(13)(A), which states that a state may not "develop rates under this section solely on the basis of budgetary appropriations." H.R.Conf. Rep. 1479, 96th Cong., 2d Sess. 154, *reprinted in* 1980 U.S.Code Cong. & Ad. News 5526, 5944.

■ The court agrees that Public Act 83–17 was solely motivated by budgetary considerations. The exhibits presented in plaintiff's memorandum conclusively show that the state legislature, facing a severe fiscal crisis, used Public Act 83–17 to attack a growing budget deficit. The court disagrees with plaintiff's contention, however, that it is a violation of the Act to have one portion of a rate schedule determined solely on the basis of budgetary considerations when the entire rate schedule, as amended, is in conformity with the Act.

Section 1396a(a)(13)(A), known as the Boren Amendment, changed the standard to be applied in determining the adequacy of state reimbursement rates. Prior to the Boren Amendment § 1396a(a)(13)(E), added to the Act in 1972, required payments to nursing homes be on a "reasonable cost-related basis." This standard was employed to raise the level of care provided in the facilities above the level created by flat-rate payment systems then in effect. *See Illinois Council for Long Term Care v. Miller*, 503 F.Supp. 1091, 1093 (N.D.Ill. 1980). However, as a result of hospital costs spiraling upwards faster than inflation and the inability of states, bound by the statutory language, to create reimbursement plans designed to engender efficiency, Congress sought to change the reasonable cost reimbursement criterion. *See* H.R.Rep. No. 158, 97th Cong., 1st Sess., Vol. II, 292 (1981). The Boren Amendment changed that criterion to one requiring payments that are "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities."

The purpose of the Boren Amendment was to grant the states more flexibility in creating reimbursement schedules and to reduce the level of reimbursement actually paid by the states. *See Charleston Memorial Hospital v. Conrad,* 693 F.2d at 331 Congress, however, was concerned that the states might cut back too far. The House Committee wrote:

> Thus, while the Committee recognizes that in this time of economic constraint and reductions in Federal funds for Medicaid, States must be given the flexibility necessary to improve the Medicaid reimbursement mechanism, the Committee does not want such policies to result in arbitrary and unduly low reimbursement levels for hospital services.

H.R.Rep. No. 158, 97th Cong., 1st Sess., Vol. II, 294 (1981). With this concern in mind, the House-Senate Conference Report stated: "The conferees would further note their intent that a State not develop rates under this section solely on the basis of budgetary appropriations."

When interpreted in the context of the history of the section and other legislative history of the Boren Amendment, this language reflects Congressional intent that states not base their entire reimbursement plan on available budgetary appropriations. *See Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 463 (E.D.Mich., 1982). This intent was effectuated within the Act itself by the "reasonable and adequate" standard. The congressional concern regarding rates based on solely budgetary considerations was no more than a reiteration of that standard. The solely budgetary language should not be read to mean that states cannot consider cost efficiency in adopting reimbursement plans. It means only that budgetary constraints cannot excuse a failure to comply with federal standards. *See Mississippi Hospital Association, Inc. v. Heckler,* 701 F.2d 511, 518 (5th Cir.1983). Defendant's argument that "solely budgetary" refers only to flat rate plans, *see Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. at 463, and plaintiff's argument that the state plan as amended by Public Act 83–17 is such a flat rate plan

are, therefore, beside the point. The question is whether the plan, as amended, provides reimbursements "reasonable and adequate to meet the costs which must be incurred by efficiently operated facilities," a question which initially must be addressed by the Secretary.

### C. *Plaintiff's Constitutional and Contractual Claims.*

Plaintiff Council finally contends in counts III and IV of the complaint that the contractual rights of its members to the rate and inflation increases barred by Public Act 83–17 have been abrogated in violation of the Fifth and Fourteenth Amendments to and the Contract Clause of the United States Constitution. Plaintiff claims the abrogated contractual rights of its members have been created directly through contracts with the state, and indirectly as third-party beneficiaries of the contract between the federal government and the state.

The contract between the state and the nursing homes receiving Medicaid is a standard form contract used with all the nursing homes involved. Paragraph 10 of that agreement states, in part: "The Facility shall receive payment pursuant to the reimbursement rates then in effect, as adopted or amended by the Department, and such rates shall constitute the full and complete charge for services rendered." This is not an illusory contract since the state is bound always to pay rates within the *Boren* standard. Plaintiff also contends that its member nursing homes are third-party beneficiaries of the Medicaid contract between the state and the federal government. Plaintiff states that the amounts due the nursing homes under both contracts are the same.

> By means of the State Medicaid Plan, the State has contracted with the federal government to reimburse plaintiff—facilities in an amount that is reasonable and adequate under federal (Boren) standards. Thus, that rate of reimbursement

is implicitly, if not explicitly, the agreed upon rate in the provider agreements. Plaintiff's Reply Memo. at p. 32.

The amount due nursing homes through contracts, by plaintiff's own reasoning, is the amount due to the homes through the reimbursement rates embodied in the state plan, as long as those rates are in conformity with the requirements of the Boren Amendment. Whether or not the rates conform is, as has been discussed, a matter still to be determined. Accordingly, in the absence of a determination that there has been a breach there can be no determination, at this juncture, of any unconstitutional violation of contract rights.

■ For the foregoing reasons, this court finds that plaintiff Council has no substantial likelihood of success on the merits. Plaintiff has not carried its burden on this threshold question and, consequently, the court declines to grant its motion for a preliminary injunction.

## IV. PLAINTIFF IHCA'S LIKELIHOOD OF SUCCESS ON THE MERITS

Because the court refuses to enjoin Public Act 83–17, it must now decide plaintiff IHCA's motion to preliminarily enjoin the recalculation of the nursing component's fixed time reimbursement rate for July to December of 1983 as violative of that Act.

The Illinois State Medicaid Plan uses the Department of Public Health's ("DPH") minimum staffing standard measured in hours, plus 5%, as the measuring stick for the amount of nursing time reimbursable under the plan. In effect, the plan is devised so that mean reimbursable nursing time in hours is always equal to 105% of the minimum time standards determined by the DPH. The mechanism for equalizing these two values is a floating hourly measurement called "fixed time".

The time element for the nursing component of the state Medicaid plan is divided into reimbursements for two separate hourly measures: variable time and fixed time.

"Variable nursing time is that time necessary to meet the major service needs of residents which vary due to their physical or mental conditions." Illinois State Medicaid Plan Attachment 4.19D, at p. 7. Variable time is measured every six months by DPA inspectors according to a "Resident Assessment Instrument" which allocates time for each service required by a facility's patients. See 89 Ill.Admin.Code, ch. I, § 140.904. Variable time is, therefore, a value empirically derived by a survey of nursing services actually performed for patient benefit without a judgment as to whether the time spent on those services is minimally required for adequate patient care. That judgment finds expression in the DPH's minimum staffing standards. Fixed time is a floating value calculated by subtracting the mean variable time from 105% of the DPH's minimum staffing standards. Though the purpose of the fixed time reimbursement is ostensibly to pay for nursing time that does not vary with patient condition, such as time spent in staff meetings or performing supervisory duties, see Illinois State Medicaid Plan Attachment 4.19–D, at p. 8, it is dependent only upon the level of mean variable time as compared with the DPH's minimum staffing requirements. If the minimum staffing requirements stay the same,[4] and mean variable time rises, then fixed time will necessarily fall. Whatever level mean variable time reaches, the total reimbursable nursing time, according to the plan, will never exceed 105% of the DPH's minimum staffing requirements.

The Illinois DPA found that mean variable time for July to December 1983 rose to the point that it exceeded 105% of the DPH's minimum staffing requirements. In order to maintain reimbursable time levels at 105% of the DPH's minimum staffing requirements, the DPA announced that the fixed time reimbursement rate would be negative for that period. Plaintiff IHCA contends that the recalculation of fixed

---

4. The DPH's minimum staffing standards were created in 1980 and based on the staffing requirements in other states, professional judgment, and the average staffing levels in Illinois.

There is no indication by either party that these standards have changed since 1980. The Secretary has already accepted the Illinois plan with these standards as a measure.

time violates Public Act 83–17. Public Act 83–17 delays any rate increase until July 1984. IHCA claims that the Act must also delay the fixed time rate decrease until 1984. What IHCA is in effect asking for is that the rise in variable time reimbursements not be offset by a recalculation of fixed time so that the total reimbursable nursing time will exceed 105% of the DPH's minimum staffing requirements.

This court does not believe that Public Act 83–17 requires such a distortion of the state's reimbursement plan for nursing time. The purpose of Public Act 83–17 was to save money by delaying inflation updates and cost increase reimbursements. It was designed to delay the effect of mechanisms which increase the total amount paid by the state. In simpler terms, it was designed to stop increases in the total size of the Medicaid pie to be divided among nursing homes. The Act was not designed to affect mechanisms which determine an equitable distribution among different facilities of a set amount of state funds. In other words, it was not designed to affect how the state divides the pie.

 The purpose of the measuring mechanism for nursing time is to determine how the pie should be divided. Because the plan equalizes mean reimbursable nursing time and 105% of the DPH's minimum staffing requirements, the amount the state must pay is fixed. The use of variable and fixed times attempts to determine which facilities require the most nursing time and to reimburse the homes accordingly. This mechanism, therefore, is not within the purview of Public Act 83–17 which seeks to reduce total state expenditures and not affect distribution. That variable time updates were performed by the state and accepted by the plaintiff's member facilities bolsters this conclusion. This court holds that Public Act 83–17 does not forbid a recalculation of fixed time reimbursement rates.

Plaintiff IHCA further argues that the reimbursement schedule in the plan is unreasonable. IHCA claims that it fails to compensate facilities completely for the nursing time actually spent because, after the adjustment, it pays for neither fixed time nor all of variable time. The Secretary, however, has already accepted a version of the Illinois State Medicaid Plan as reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities. The Secretary, therefore, has already accepted the state's system which puts a limit of the amount of mean nursing time that is reimbursable. Whether such a limit is now unreasonable under the Boren Amendment, in light of the changes in the plan created by Public Act 83–17, or in light of changed patient care or patient profile conditions is also for the Secretary to determine. This court, as stated in response to the previous motion, declines to make such a determination on this motion.

For the foregoing reasons, this court finds that plaintiff IHCA has no substantial likelihood of success on the merits. Because this plaintiff has also not carried its burden on this threshold question, the court declines to grant its motion for a preliminary injunction.