Carrie P. HARRIS and James F. Goldsby, on behalf of themselves and all others similarly situated; and Pansy Adams, Appellants,

v.

William L. LUKHARD, individually and as Commissioner of the Virginia Department of Welfare; James B. Kenley, individually and as Commissioner of the Virginia Department of Health; Robert J. Treibley, individually and as Acting Director of the Virginia Medical Assistance Program; Bill R. Baker, A. Martin Cader, M.D., Ann E. Cook, Grafton B. Daniel, M.D., Kathleen D. Hopkins, Evonne Knauff, Susan C. Oertel, individually and as members of the Virginia Medical Assistance Program Appeals Board; Leighton B. Langford, Jr., individually and as Director of the Bedford County Department of Social Services; and Ruth J. Jones, individually and as Director of the Prince Edward County Department of Social Services, Appellees.

No. 82–1703.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 7, 1983.

Decided May 2, 1984.

J. Barrett Jones, Lynchburg, Va. (Jill A. Hanken, Virginia Poverty Law Center, Richmond, Va., Martin Wegbreit, Castlewood, Va., Client Centered Legal Services of Southwest Virginia, on brief), for appellants.

Robert T. Adams, Asst. Atty. Gen., Richmond, Va. (John A. Rupp, Senior Asst. Atty. Gen., Richmond, Va., Gerald L. Baliles, Atty. Gen., Richmond, Va., on brief), for appellees.

Before WINTER, Chief Circuit Judge, RUSSELL, Circuit Judge, and FAIRCHILD,[*] Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Three named plaintiffs, one now deceased, brought a class action against several Virginia state and other officials. Mrs. Adams was permitted to intervene as a plaintiff. Plaintiffs had been denied eligibility for Medicaid benefits because they owned real estate exceeding specified values. They challenged procedures used by defendants (hereafter the agency) to evaluate real property resources and plaintiffs sought injunctive and declaratory relief. Both sides moved for summary judgment. The district court certified a plaintiff class, but granted the agency's motion and directed that the case be stricken from the docket. Plaintiffs appealed.

The district court's conclusions, some of which are challenged here, appear in *Harris v. Lukhard*, 547 F.Supp. 1015 (W.D.Va. 1982).

### I. Use of Tax Assessments to Determine Value

Under Virginia's Plan, ownership of one's home does not affect eligibility. Ownership of other real estate which produces a specified rate of return does not affect eligibility if the individual's equity does not exceed $6,000. Ownership of other real estate precludes eligibility unless its market value, added to liquidable personal property, does not exceed $1,500 for a single person and $2,250 for a married couple living together.

In determining the market value of real estate, the agency relies on the current

---

[*] Honorable Thomas E. Fairchild, Senior Circuit Judge for the Seventh Circuit Court of Appeals, sitting by designation.

assessment for tax purposes. No other evidence of value is considered, except that an applicant may show that the property cannot be sold, after a reasonable effort for sale has been made, or if sale would involve unreasonable loss. *See* 547 F.Supp. at 1018 n. 1.

Plaintiff Adams owns an interest in two pieces of real estate on which she does not reside. She gains income from one of them. The agency accepted the assessed valuations of the two parcels, and counted her share of the values against her. The agency refused to consider opinions of a county revenue commissioner and a bank officer that the parcels are worth less than the assessed values and less than enough to render her ineligible.

Plaintiff Goldsby owned his home site and adjoining land, separately assessed. The agency counted the assessed valuation of the adjoining land against him. The agency refused to consider the opinion of a realtor that the fair market value was substantially less than the assessed value and less than $2,250, the threshold amount for ineligibility.

The facts as to plaintiff Harris will be later referred to.

Federal law requires that a state plan shall "include reasonable standards ... for determining eligibility," "provide for taking into account only such ... resources as are ... available to the applicant or recipient," and "provide for reasonable evaluation of any such ... resources." 42 U.S.C. § 1396a(a)(17).

The Constitution of Virginia, art. X, § 2, requires assessment of real property at fair market value. An affidavit of the Director of the Property Tax Division in the Virginia Department of Taxation states that although localities had historically made fractional assessments, effective January 1, 1977 all real estate undergoing reassessment must be made at 100% of fair market value. Comparisons of sales prices with assessed values show that after general reassessments, assessed values average from 5 to 15% below sales prices. To the best of affiant's knowledge no county or city sales/assessment ratios have ever exceeded 100%. An affidavit by a professional appraiser and filed by plaintiffs does no more than point out the possibility of error, that as properties or neighborhoods deteriorate the assessments could exceed fair market values, and that in some counties and cities assessments are closer to fair market values than in others.

In their brief, plaintiffs assert, without specifying any support, that the assessment system "is inherently so unreliable that it should not be used as the sole method of determining fair market value." They also say, however, that they do not "argue that tax assessments are usually greater than fair market value," and that "Plaintiffs agree that the procedures used to set tax assessments are generally adequate."

Plaintiffs seem principally to rely on a statement in *Board of Supervisors of Fairfax County v. Leasco Realty, Inc.*, 221 Va. 158, 166, 267 S.E.2d 608, 613 (1980) as follows:

... [I]f it is impractical or impossible to enforce both the standard of true value and the standard of uniformity, the latter provision is to be preferred as the just and ultimate end to be attained.

From this, they argue that application of the principle of uniformity will inevitably cause and will legally justify assessments in excess of fair market value. It is clear, however, from the Virginia cases that plaintiffs' assertion is wrong. The principle of uniformity will sometimes require an assessment below fair market value, but never above it.

*Leasco* was itself a case in which a taxpayer sought a reduction based on the principle of uniformity. The court cited *Smith v. City of Covington*, 205 Va. 104, 108, 135 S.E.2d 220, 222–23 (1964) to support the statement plaintiffs quote. The *Smith* court had quoted almost identical language from *Skyline Swannanoa v. Nelson County*, 186 Va. 878, 881, 44 S.E.2d 437, 439 (1947) and then quoted the explanation of that language given in *Tuckahoe Wom-*

*an's Club v. City of Richmond,* 199 Va. 734, 738, 101 S.E.2d 571, 574 (1958):

> But that does not mean that property in any taxing jurisdiction may be assessed in excess of and without relation to its fair market value as required by the Constitution. It means only that a taxpayer whose property is assessed at its true market value has a right to have the assessment reduced to the percentage of that value at which others are taxed so as to meet the uniformity required.

*See also, Southern Ry. v. Commonwealth,* 211 Va. 210, 176 S.E.2d 578, 581 (1970).

Thus, contrary to plaintiffs' argument, there is no principle of Virginia law which can cause an assessment to exceed fair market value.

Of course, a particular assessment may reflect an error. The property owner may apply for correction to the official who made the error, § 58–1144, Va.Code, or may apply to a court for relief, § 58–1145, Va.Code. The plan affords another safeguard. An applicant may demonstrate that he has made a reasonable effort to sell and has been unable to do so without unreasonable loss. The latter is not only a protection against over valuation of applicant's property, but it refutes plaintiffs' argument that the Virginia Plan permits taking into account resources which are not available to the applicant.

Federal law also requires that a state plan must provide for an opportunity for a fair hearing. 42 U.S.C. § 1396a(a)(3). Regulations provide that:

> (b) The State's hearing system must provide for—
>
> (1) A hearing before the agency; or
>
> (2) An evidentiary hearing at the local level, with a right of appeal to a State agency hearing.
>
> .    .    .    .    .
>
> (d) The hearing system must meet the due process standards set forth in *Goldberg v. Kelly,* 397 U.S. 245 [90 S.Ct. 1011,

25 L.Ed.2d 287] (1970), and any additional standards specified in this subpart.
42 C.F.R. § 431.205.

Under additional standards of the fair hearing system:

> The applicant ... must be given an opportunity to ... (c) Establish all pertinent facts and circumstances; ... and (e) Question or refute any testimony or evidence, including opportunity to confront and cross-examine adverse witnesses.
42 C.F.R. § 431.242.

Plaintiffs assert that the Virginia Plan violates these requirements because an applicant is not permitted to produce evidence to establish the value of his real property if different from the assessment nor to refute the assessment.

It may be a sufficient answer that as to valuation of resources only a "reasonable evaluation" is required, and the use of assessment values, with the opportunity to contest them elsewhere, fulfills that requirement.

In any event, Virginia provides a fair hearing before a court which will consider additional evidence of fair market value in reviewing the assessments. §§ 58–1145, *et seq.; Smith v. City of Covington, supra.* Plaintiffs contest reliance on this right of review as a delegation of this part of the Medicaid agency's task. We think that even if viewed as a delegation, it is appropriate and permissible. Although the regulations prohibit delegation of several types of functions, *e.g.,* 42 C.F.R. § 431.10(e)(1), there is no prohibition pertinent to valuation of resources of an applicant.

Plaintiffs do point out that where one tract of land, assessed as a unit, includes both an exempt homesite and a countable resource, it may be unfair to prorate the assessed value to determine the value of the countable portion. Such proration assumes that the land is of uniform value, and that may not be true. We might well agree that in such a situation the agency could not refuse to consider evidence that the value per acre of the countable portion was substantially below the value per acre

of the exempt portion, and accordingly below the prorated value per acre of the entire tract. Exclusive reliance upon prorating the assessed valuation in that situation might well be unreasonable and unfair.

The only plaintiff whose case even suggests this particular problem is Harris. Plaintiff Harris owned a .92 acre parcel on which her house was located. The land was separately assessed at $1,800. She owned an adjacent 3.41 acre parcel, assessed at $3,400. The agency agreed initially to treat .49 acre of the adjoining parcel as additional homesite. On appeal, the agency allowed an additional acre, leaving only 1.92 acres of the adjoining parcel non-exempt. Using proration, the agency determined the countable value as approximately $2,000. She had presented the opinion of a realtor that the value of the 3.41 acres "is $1,500 or about $500 an acre." The realtor's opinion clearly conflicted with the assessment value of $3,400, but we have concluded that such conflict is immaterial. The realtor did not assert, however, that the countable 1.92 acre portion was for any reason less valuable than the balance of the 3.41 acres. We are, accordingly, not in a position to assume that if the realtor had stated that opinion, the agency would have refused to consider it.

We hold that the agency does not violate federal law when it relies on the assessment to establish the value of a parcel of real estate, but our decision must not be construed as approval of reliance on proration of an assessed valuation in the face of evidence that proration is unreasonable and unfair.

## II. The Determination of Unsalability

Under Virginia's Plan, ownership of real property of a value over the limiting amount will not preclude eligibility if "the property cannot be sold, after a reasonable effort for sale has been made or if sale would involve unreasonable loss."

Thus an applicant can refute the assessed value, or demonstrate unavailability of the resource, by showing he had made a reasonable effort to sell and had either been unsuccessful or had only received offers which would result in unreasonable loss, presumably as compared with the assessed value.

It was established that in practice the agency would deem property unsalable in the absence of an effort to sell if zoning restrictions or lack of access made it clear the property could not be sold.

Plaintiffs argue that there is a lack of due process because the terms "reasonable effort for sale" and "unreasonable loss" are not sufficiently specific to constitute articulated standards, and because the exceptions recognized in practice are not stated at all.

The district court suggested that plaintiffs may be correct on the merits, but lack standing to make the claim because they did not show any effort to sell or that their property fell within the exceptions. With respect, we disagree on both points.

All plaintiffs challenged the use of assessed valuation in determining the value of their property. In this context, we are unable to separate their claim of excessive vagueness of the unsalability provision from the objection to the agency's use of assessed values. One of the safeguards tending to make it reasonable to rely on the tax assessment system is the provision for proving unsalability. That provision is also an answer to the plaintiffs' claim that the system results in counting resources that are not available. If the unsalability provision is so vague that it is void it cannot be relied on to show that the use of the tax assessments is valid. In this context the court necessarily must consider the validity of the unsalability provision.

The inseparability of the claim of invalidity of the unsalability provision, on account of vagueness, from the challenge to the valuation procedure, can be further illustrated.

It appears from the pleadings that plaintiff Harris viewed her contacts with realtors and their appraisal of her land as "evidence that her land was not marketable at the value assessed by the County." In

the decision on appeal, the Board told Mrs. Harris that the appraisals cannot "be used to determine the salability of property, unless a reasonable effort to sell the property has been made. If you try to sell the excess acreage and cannot sell it your eligibility for Medicaid can be re-examined."

Thus the allegedly vague provision was not only relied on by the agency to decide that a realtor's opinion did not determine unsalability, but Mrs. Harris was invited to pursue the allegedly vague procedure and then reapply. A similar invitation was extended to Mr. Goldsby.

■ In any event, all plaintiffs were denied Medicaid benefits by applying the agency's valuation procedure, and because the provisions are so closely interrelated, we think plaintiffs had standing to challenge the unsalability part of the procedure as vague.

Plaintiffs rely on a series of decisions that where an agency grants and denies applications for public housing or similar benefits, there must be articulated standards to govern the choice in order to afford due process. *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974); *Hornsby v. Allen*, 326 F.2d 605, 610 (5th Cir.1964); *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir.1968); *White v. Roughton*, 530 F.2d 750, 753 (7th Cir.1976); *Carey v. Quern*, 588 F.2d 230, 232 (7th Cir.1978). The concern of these courts was "to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries." 415 U.S. at 231, 94 S.Ct. at 1072.

Virginia's Plan, however, does contain articulate standards. Granting that an apparent standard might be so vague as to be no standard at all, we are not aware of any pertinent case so holding.

Plaintiffs seem to suggest that the Plan could specify the type of sales effort which would suffice, *i.e.*, the nature and duration of advertising or of listing with a realtor, and some percentage of the assessed value as the limit of unreasonable loss. Doubt-

less one could attempt to construct so detailed a standard. The use of the term "reasonable," however, permits the agency to make its determination in the light of all the circumstances of a given case, but does not open the matter up for uncontrolled discretion and arbitrary decision.

The use of variations of the term "reasonable" has been found not to deny due process even in defining prohibited conduct. *United States v. Ragen*, 314 U.S. 513, 523–24, 62 S.Ct. 374, 378–79, 86 L.Ed. 383 (1942); *Jim Crockett Promotion, Inc. v. City of Charlotte*, 706 F.2d 486, 489 n. 3 (4th Cir.1983). *See also Fleming v. United States Dept. of Agriculture*, 713 F.2d 179 (6th Cir.1983).

The materials before the court on summary judgment include a number of agency decisions and interpretations. Plaintiffs have not claimed, nor have we observed that the agency has applied the unsalability provision (or its unwritten exceptions) in an arbitrary manner.

Although the text does not reflect the agency's willingness to find property unsalable on account of zoning restrictions or lack of access, those minor exceptions to a strict application of the requirements of an effort to sell seem highly reasonable and likely to be disclosed to anyone when inquired. They would not come as a surprise to any person of ordinary intelligence. In our view, they do not have the significance to make their absence from the text a denial of due process.

■ We conclude that the unsalability provision fulfills the requirement of an articulate standard.

### III. Real Property Contiguous To A Residence

Plaintiffs Harris and Goldsby lived on tracts which were deemed larger than essential for a homesite. The values of the homesites were exempt. The values of the excess portions were counted against them and they were found ineligible. The parties have referred to the excess portion as "real property contiguous to a residence."

When this action was begun, the relevant part of the Plan provided: "A home means the house and lot, including adjoining land used for a vegetable garden and/or for outbuildings essential to the dwelling. It does not include land and outbuildings used for farming purposes." In 1972, the wording was almost identical. Each version has been construed so as to exempt only the home as defined, and contiguous land has been counted as a resource whether or not actually used for farming purposes. *See* Part VI of the district court opinion, 547 F.Supp. at 1031–32.

On appeal plaintiffs have confined their claim of error to Part VI–C, 547 F.Supp. at 1033. The parties stipulated that from the beginning of Medicaid until January 1, 1974 real property contiguous to the residence was counted as a resource. The Plan was then amended to provide that contiguous land was included with the home, although value of a home over and above $25,000 would be counted. The Plan was amended in January, 1978 so that real property contiguous to a residence would again be counted. Such counting had been "reinstated" July 1, 1976.

In 1975, Virginia had enacted the Administrative Process Act, § 9–6.14:1 *et seq.* Section 9–6.14:7 requires that where a contemplated regulation "is of a substantive nature" the agency shall afford interested persons an opportunity to submit data, views, and argument. Published notice is required.

The parties stipulated that the agency had not published notice of the opportunity for submission of views prior to the 1976 or 1978 amendments by which property contiguous to a residence was again counted as a resource. Under the pertinent definition, it seems clear that these amendments were "substantive."

Plaintiffs appear to claim that if the counting of contiguous land was reinstated without compliance with the Virginia APA the denials of benefits based on such counting were unlawful under state law. Plaintiffs have treated the claim as one under pendent jurisdiction.

As of September 24, 1981 the agency avoided the problem at least temporarily. Without conceding invalidity, the agency adopted an emergency regulation, as permitted by § 9–6.14:6(iii). It expressly made countable "ownership of land contiguous to the dwelling site." Although this regulation would make prospective relief unnecessary, and the Eleventh Amendment prohibits a federal court judgment for damages for past denials, the question has not been rendered moot. The possibility of redress for past unlawful denials through state procedures keeps the question justiciable. *Randall v. Lukhard,* 709 F.2d 257, 269–70 (4th Cir.1983), *as adopted after rehearing in banc,* 729 F.2d 966 (4th Cir.1984).

The agency contends that notice of an opportunity to submit views was not required because Medicaid benefits are a grant of state and federal funds. Section 9–6.14:20 provides: "There shall be exempted from the operation of this chapter any agency action relating to the following subjects: ... (ii) grants of State or federal funds or property."

Plaintiffs respond with an argument that Medicaid benefits constitute public assistance and that in this particular statute, at least, the term "grants of State or federal funds" does not include grants of public assistance.

The Virginia APA contains six Articles: Article 1, General Provisions, Article 5, Subject Exemptions, and Article 6, Costs and Attorneys' Fees, are of general import. Article 2, Regulations, sets forth procedural requirements respecting adoption of regulations, including § 9–6.14:7, allegedly violated here. Article 3, Case Decisions, governs procedure before the agency in cases involving named parties, including a party claiming compliance with a requirement for obtaining a benefit. Article 4, Court Review, provides for judicial review of regulations and case decisions. The grant-of-funds exemption relied on by the agency, §.9–6.14:20(ii), is found in Article 5, and is an exemption from every Article. Articles 2, 3, and 4 each begin with a list of exclusions from that Article. Article 3, Case

Decisions, begins with § 9–6.14:10, "This Article shall not apply to case decisions respecting ... (iii) the grant or denial of public assistance...." Plaintiffs' argument, which is plausible as a matter of statutory construction, is that if the general grant-of-funds exemption exempts grants of public assistance from Articles 2, 3, and 4, the specific exclusion of public assistance from Article 3 performs no function. Therefore, plaintiffs say, the terms "grant of State or federal funds" and "grant or denial of public assistance" must be mutually exclusive, and a grant or denial of public assistance is not exempted from Article 2, Regulations, or from Article 4, Court Review.

A difficulty for plaintiffs is that although there is no decision of the Supreme Court of Virginia on the point, every Virginia court which has met the question has decided that the general grant-of-funds exemption exempts denials of public assistance from Article 4, Court Review, and exemption from Article 2, Regulations, must stand on the same footing. Two of these Virginia Circuit Court decisions, *Nelson* and *Taylor,* were considered by the district court. 547 F.Supp. at 1033.

Other decisions have come later. On August 20, 1982 the Circuit Court for Madison County decided *White v. Madison County Department of Social Services and Commonwealth of Virginia,* Chancery No. 16–1710. Cancellation of White's Medicaid benefits was held to be excluded from judicial review (Article 4) because the decision involved the grant or denial of state or federal funds. On September 2, 1982, the Circuit Court for the City of Richmond, decided *Redd v. Department of Welfare,* Law No. LE–1636. Agency decisions under ADC and the Food Stamp Programs were held to be decisions relating to grants of state or federal funds, and therefore exempt from judicial review (Article 4). On October 1, 1982 the Circuit Court for Culpeper County decided *Nesselrodt v. Virginia Department of Welfare,* Chancery No. 80–C–82. Denials of general relief and hospitalization assistance were held to be exempt from judicial review (Article 4) as

relating to grants of state or federal funds. The pertinent regulations were held "likewise excluded from judicial review."

Plaintiffs rely on an opinion of the Attorney General of Virginia, September 7, 1977. The Attorney General replied to an inquiry of the Commissioner of Public Health concerning Medicaid funding of abortions in the light of the Hyde Amendment restriction on use of federal funds for abortions. In part, the Attorney General advised that if the relevant provisions for the state plan were to be changed, the APA would require published notice of an opportunity to submit views. Although the opinion considered and rejected a possible exclusion from the publication requirement not relevant here, there was no mention of the grant-of-funds exemption now relied on, and therefore nothing to show whether it was considered. After the district court decision in this case, the Attorney General issued an opinion July 29, 1982 advising the Commissioner that the APA does not apply to the activities of the Virginia Medicaid Program, relying on the grant-of-funds exemption. He noted the earlier opinion, but concurred with the opinions of the district court in this case and of the state circuit courts.

■ If, as here, the highest court of the state has not addressed the issue, a federal court should attribute some, but not controlling, weight to the state's lower courts' interpretations of the state statute in question. *C.I.R. v. Estate of Bosch,* 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 1783, 18 L.Ed.2d 886 (1967).

■ We have considered the possibility that the Supreme Court of Virginia might follow the statutory interpretation advocated by plaintiffs, but it is our best judgment that it would follow the uniform decisions of the lower state courts. It seems most unlikely that the Legislature intended judicial review of denials of public assistance, and the only apparent way to avoid such review is to apply the grant-of-funds exemption as the circuit courts have done.

Exemption from Article 2 necessarily follows.

The judgment appealed from is AFFIRMED.