**MARY WASHINGTON HOSPITAL, INC., Plaintiff,**

v.

**Joseph L. FISHER, et al., Defendants.**

**Civ. A. No. 83–0551–R.**

United States District Court,
E.D. Virginia,
Richmond Division.

Jan. 4, 1985.

William M. Sokol, R. Scott Pugh, Sokol, Ledbetter & Haley, Fredericksburg, Va., John E. McDermott, Memel, Jacobs, Pierno & Gersh, Los Angeles, Cal., for plaintiff.

Gerald L. Baliles, Atty. Gen., John A. Rupp, Sr. Asst. Atty. Gen., Roger L. Chaffe, Asst. Atty. Gen., Julia Krebs-Markrich, Robert T. Adams, Asst. Attys. Gen., McGuire, Woods & Battle, Richmond, Va., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MERHIGE, District Judge.

This action challenges Virginia's compliance with requirements of the Federal Medicaid Act, 42 U.S.C. § 1396 *et seq.* and its implementing regulations 42 C.F.R. Part 447 regarding reimbursement rates for inpatient hospital services.

The defendants are officials of the Virginia Medical Assistance Program (VMAP), the program through which the Commonwealth of Virginia participates in Medicaid. Medicaid is a cooperative federal-state program that furnishes medical assistance to persons who could not otherwise afford medical care. The plaintiff, Mary Washington Hospital, is a non-profit hospital located in Fredericksburg, Virginia. Pursuant to a contract with the Commonwealth of Virginia, it is a provider of hospital services to Medicaid recipients. Jurisdiction is premised on 28 U.S.C. § 1331.

### Background

The federal Medicaid Act confers on the participating state agencies the task of administering their Medicaid programs in accordance with federal law and regulations. In exchange, the Federal government pays roughly half the cost of the programs.

Until 1981, federal Medicaid law required the state agencies to pay hospitals the "reasonable cost" of inpatient services they rendered to Medicaid recipients. "Reasonable cost" was a term used and defined in detail in the wholly federally-run Medicare program, a different type of program benefitting primarily elderly Americans regardless of financial resources. As a general rule, the "reasonable cost" reimbursement method meant care they provided Medicaid (or Medicare) recipients. The method operated retrospectively, with the hospitals receiving an interim rate during the fiscal year and then making year-end settlements once they had established their actual, allowable costs for the year.

On July 31, 1981, Congress enacted the Omnibus Budget Reconciliation Act of 1981 (OBRA of 1981), Public Law 97–35. Section 2173 of that Act repealed the "reasonable cost" standard and replaced it with requirements designed to give the states greater flexibility in attempting to promote efficiency in hospital services and to contain soaring Medicaid costs.

The amended federal laws provide *inter alia* that participating states must pay for inpatient hospital services:

through the use of rates (determined in accordance with methods and standards developed by the State....) which the State finds and makes assurances satisfactory to the Secretary [of the Department of Health and Human Services], *are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities* in order to provide care and services in conformity with applicable State and federal laws, regulations, and quality and safety standards and *to insure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality....*

42 U.S.C. § 1396a(a)(13)(A) (emphases added).

The two highlighted portions of the law can be usefully labelled respectively as the "efficiency and economy" standard and the "reasonable access" standard for hospital reimbursement rates.

The legislative history clarifies that the amendment was intended to allow states to abandon the retrospective "reasonable cost" principles of reimbursement in favor of some form of prospective rate-setting system. H.R.Rep. No. 158, 97th Cong., 1st Sess. (1981), *reprinted in* 1981 U.S.Code Cong. and Ad.News at 396, 744. Under a prospective system, a rate is determined in advance of the fiscal year for each hospital or for various classes of hospitals. The hospitals are reimbursed at the pre-determined rate and must absorb the loss if

their actual costs exceed that rate. The legislative history also clarifies that the greater flexibility being given to the states was intended to allow them to incorporate incentives for efficient performance into their rate-setting, not to encourage "arbitrary reductions in payment that would adversely affect the quality of care." *Id.*

Working somewhat against this assurance in the legislative history, other provisions of OBRA strongly encouraged the states to contain their Medicaid costs within fixed limits starting in 1982. If a state failed to stay within the limits suggested, it would suffer substantial financial penalties in the form of reduced federal contributions to the program. *See* 42 U.S.C. § 1396b *et seq.* In short, OBRA of 1981 put the state Medicaid agencies in an intractable position and left them to their own devices as to how to cope with the situation.

On September 30, 1981, the Health Care Financing Administration (HCFA), as designee of the Secretary of the U.S. Department of Health and Human Services (HHS), published regulations implementing 42 U.S.C. § 1396a(a)(13)(A). *See* 42 C.F.R. § 447.250 *et seq.* (1981). The regulations provide in pertinent part that (a) inpatient hospital service payment rates must be reasonable and adequate to meet the "economy and efficiency" and "reasonable access" standards described *supra;* (b) that the states must make findings to that effect; and (c) the states must make assurances to HCFA that requirements (a) and (b) *supra* have been met. 42 C.F.R. § 447.252(a)(b) and (c). The regulations also require each state to provide an appeals procedure that allows individual hospitals an opportunity to submit additional evidence and request prompt administrative review of payment rates. 42 C.F.R. §§ 447.252(e), 258.

In Virginia, the state's Medicaid budget had increased at an average annual rate of 20.9% between 1974 and 1980, which was well over the state budget's overall 10.7% annual growth rate for the same period. Additionally, preliminary projections sug-

gested that, absent changes, VMAP would run a $122.6 million deficit for the biennium budget period of July 1, 1982 to June 30, 1984. Hence not surprisingly, Virginia acted promptly to respond to the federal legislative actions of 1981.

The administration in office in Virginia in the fall of 1981 proposed to effect substantial savings in the Medicaid budget by eliminating a group known as the "medically needy" from eligibility for Medicaid. This group of persons are above the economic margin of poverty in terms of other welfare programs, but cannot afford to pay extraordinary expenses such as medical services. Under Federal Medicaid law, participating states agencies may choose whether or not to extend Medicaid eligibility to this group. In the past, Virginia has always chosen to extend eligibility to this group. Reversing this policy, as the administration proposed, would have been one clearly legal way for Virginia to comply with the federal cost-containment mandate and to avoid its own projected Medicaid deficit.

That administration left office in January of 1982. The incoming administration (the Robb administration) sought to find some alternative cost-containment package, criticizing the option of cutting the medically needy as inhumane. A Medicaid Task Force, comprised of representatives from the relevant state agencies and legislative committees and from the Attorney General's Office, was formed early in 1982 to examine ways to reduce Medicaid expenditures in the next biennium. The General Assembly, which meets in Virginia for approximately two months at the beginning of each year, enacted a biennial budget in March of 1982 that mandated reductions in VMAP's share of the state's funds of $122.6 million for the biennium. The Budget Act specified how some of the Medicaid reductions were to be made (none involving hospital reimbursement), but because of time considerations, it left to the Governor and the Board of Health the responsibility for determining how the remaining reductions were to be made. The Budget Act did direct the Governor and the Board of Health to revise the reimbursement programs for hospitals and nursing homes as part of the reduction effort. House Bill No. 30, Item 418.

Between March and July of 1982, the Task Force met often and appears to have worked diligently in a conscientious effort to develop proposed cost-containment measures, including revised reimbursement systems for hospitals and nursing homes. It worked with the Board of Health as well as with the administrative agencies and legislative standing committee staffs. It obtained technical assistance from a consulting firm, Arthur Young & Co., in developing its proposals for revising the reimbursement systems for hospitals and nursing homes. It met with representatives of the hospital industry and the public, and at least one public hearing was held on the proposals.

The Task Force's final package of proposals included cuts in eligibility and services as well as savings attributed to changing hospital and nursing home reimbursement to a prospective payment system. Of the $122.6 million in cuts mandated for the biennium, the Task Force determined that savings of $14.9 million in state funds could come from hospital reimbursement. (The hospitals would also collectively lose a roughly similar amount in federal matching funds).

The Board of Health adopted the Task Force's package of proposals, with minor revisions, at its meetings on June 7 & 8, 1982. The Governor also approved the package and transmitted an amended state plan, incorporating the approved changes, to HCFA on June 30, 1982. After several exchanges of letters in the fall of 1982, in which HCFA requested and received additional information and assurances, the amended state plan received HCFA's approval, retroactive to July 1, 1982.

In the prospective payment system that Virginia adopted, hospitals are grouped into "peer groups" according to their number of beds ("bedsize") and whether they are located in an urban or rural area. For

each group of hospitals, a prospective reimbursement ceiling on allowable operating costs was established as of July 1, 1982.

The calculation of the initial group ceilings was based on available, allowable cost data for the hospitals in calendar year 1981. Those cost figures were advanced by a "reimbursement escalator" from the hospitals' fiscal year ends to July 1, 1982. After this advancement, the median operating costs were determined for each group. The medians for the urban groups were then further adjusted to account for wage variations between different Standard Metropolitan Statistical Areas (SMSAs), resulting, for the urban hospitals, in a series of adjusted medians representing one (per bedsize) for each SMSA.

The medians thus calculated became the reimbursement ceiling rates for the year beginning July 1, 1982. Hospitals whose actual costs were above the applicable median were reimbursed at the median rate. Hospitals whose actual costs were below the median were reimbursed their actual costs plus a percentage of the difference between their actual costs and the median, as an incentive for staying below the median.

In years following, the rates fixed for 1982 are to be updated by the "reimbursement escalator" rather than on a recalculation of allowable costs. The index chosen to be the reimbursement escalator, both to roll the 1981 cost information forward to July 1, 1982 to determine the initial ceilings, and to update the initial ceilings in later years, is the Consumer Price Index (CPI) (excluding housing and interest components since the ceilings only apply to operating costs).

This is the basic system. It is qualified in several ways. Depreciation, capital interest, and education costs are considered as pass throughs and are not part of the calculation. Outpatient services continue to be paid on a "reasonable cost" basis in order to encourage this more economical form of care. Additionally, the system recognizes exceptions to the reimbursement ceilings for facilities that have dispropor-

tionate numbers of Medicaid patients and for institutions providing a high intensity of neo-natal care.

The provider appeals process will be described in more detail *infra*. Suffice it to say here that the process does not allow hospitals to seek to be excepted from the applicable ceiling or otherwise to seek reimbursement above that ceiling.

Mary Washington Hospital is located near the edge of both the Washington, D.C. and the Richmond, Va. SMSA's, but not within either. Hence it is grouped with other rural hospitals of its bedsize. It does not qualify for the exceptions for disproportionate numbers of Medicaid patients or high-intensity neonatal care.

Mary Washington contends that because of its proximity to the SMSA's, its wage costs are disproportionate to those of the other hospitals in its grouping, a difference that the Virginia system does not take into account. Mary Washington also contends that it is exceptional in its peer group because it is a "sole community provider." "Sole Community Provider" is a term used in *Medicare's* new prospective payment system to denominate a hospital that must offer a wider range of services than would be expected in rural hospitals, because of the absence of other hospitals in the community. "Sole community provider" status entitles Mary Washington to a higher-than-usual ceiling under *Medicare's* new system, but not under Virginia's Medicaid system.

Mary Washington challenges the failure of Virginia's system to take into account these and other factors that allegedly affect its cost of efficient operation. It also challenges the use of the CPI as the reimbursement escalator, and particularly the failure of the system to recognize increases in operating costs resulting from the addition of new and necessary services. As to this latter, Mary Washington itself added certain new services that the state licensing authorities approved well before 1982 but that were not opened until 1982. Mary Washington contends that these new services unavoidably increased their operating costs per patient-day, and the Virginia sys-

tem unfairly fails to adjust Mary Washington's rate ceiling because of this fact.

Mary Washington argues that Virginia should have taken the aforementioned factors into account in setting its rate ceilings, or, short of that, should allow hospitals to appeal from the rate ceilings on such grounds. Mary Washington also challenges the use of medians as ceilings, arguing that this method depends on the false assumption that all hospitals with costs above the median are inefficient and uneconomical. Finally, Mary Washington contends that Virginia failed to make the requisite findings that its rates are reasonable and adequate to meet the federal "economy and efficiency" and "reasonable access" standards.

## DISCUSSION

*Standard of Review*

■ Mary Washington contends that Virginia's decision to adopt a prospective payment system is subject to the provisions of the Federal Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*. This, in the Court's view, is incorrect. The Act is clear on its face that it applies only to federal agencies. 5 U.S.C. § 551(1).

Both parties agree that the Virginia Administrative Process Act was likewise not, at the relevant times, applicable to state agency actions affecting Medicaid. *See* 1982 Acts of Assembly, Chapter 684, item 418H; *Harris v. Lukhard,* 547 F.Supp. 1015 (W.D.Va.1982), *aff'd* 733 F.2d 1075, 1082 (4th Cir.1984).

Accordingly, the federal court's role is limited to deciding whether the applicable federal Medicaid law and regulations have been satisfied. *See Mississippi Hospital Ass'n. v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983).

■ Of course, the same presumption of validity that would apply to a federal agency action attaches also to state agency actions. So long as the specific requirements of the law are met, the Court must defer to the agency's exercise of discretion unless it acts arbitrarily or capriciously. *See Missis-*

*sippi Hospital Ass'n. v. Heckler, supra; Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

Because the notion that agency discretion must not be exercised arbitrarily or capriciously is implicit in the Medicaid legislation itself, the only significant consequence of the APA's inapplicability is that justification of the agency action need not be based solely on the record that was before the agency at the time of the decision. Even this result is of relatively little practical importance in the instant case, as the Court's decision rests ultimately almost exclusively on the written administrative record and the testimony of the agency officials relating to the administrative process they went through in adopting the new system.

The pertinent federal law and regulations require Virginia to make findings that its rates are reasonable and adequate to meet the "economy and efficiency" standard and the "reasonable access" standard. The plaintiff contends that Virginia failed to make either findings, and furthermore that such findings would have been arbitrary and capricious in light of the evidence in the record. The state acknowledges that it made no specific *written* findings but counters that its Medicaid Task Force made the necessary findings orally and had a reasonable basis for so doing.

■ The Court rejects plaintiff's contention that Virginia must have made *written* findings. The federal regulations do not specify that the findings must be in writing. Consequently, it becomes necessary to consider each of the two standards in turn, asking whether the task force did indeed make the necessary finding and whether any such finding was reasonable in light of the facts. This opinion will discuss the two standards sequentially in the next two sections.

■ The additional regulatory requirement that the state agency make assurances "satisfactory to the Secretary [of HHS]" that findings have been made, etc.

will not be addressed in any detail. The record is clear that HCFA, as the Secretary's designee, approved the amended state plan, thereby signifying that the assurances provided were indeed "satisfactory" to the Secretary. The Secretary is not a defendant here, and the Court does not see how an examination of the adequacy of the *assurances,* as a distinct question from the adequacy of the *findings* to which the assurances relate, would be fruitful. It should be noted, however, that the plaintiff is apparently correct in its contention that at least one of the assurances given to the HCFA (regarding the appeals process) was in error. This fact detracts from any weight that HCFA's resultant approval of the plan might otherwise have carried with the Court. *See Aitchison v. Berger,* 404 F.Supp. 1137, 1148 (S.D.N.Y.1975), *aff'd,* 538 F.2d 307 (2nd Cir.), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

Finally, the additional regulatory requirement of an appeals process is significant and will be addressed separately *infra.*

*"Economy and Efficiency" Standard*

Federal law and regulations require Virginia to reimburse hospitals at rates which it finds are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities ..." 42 U.S.C. § 1396a(a)(13)(A).

The plaintiffs' first argument on this point is that satisfactory findings were simply never made. The Court has already expressed its views on the absence of written findings. Mary Washington argues, though, that even if the law does not require written findings, there must be some evidence that all relevant factors in determining hospital efficiency and economy were considered. Mary Washington correctly points out that Arthur Young & Co. never performed an exhaustive study of this nature for the state.

■ However, the state is correct in its response that the Task Force itself performed this role. It gathered information from past hospital cost reports (reflecting actual, allowable costs). It drew on the expertise and knowledge of its members. It met with representatives of the hospital industry and the public. With information from each of these sources in hand, the Task Force set out to devise a prospective payment system that would comply with the federal requirements. The "economy and efficiency" standard was given explicit attention, and the task force's recommendation of the plan ultimately adopted represents its oral conclusion that the plan indeed met that standard. A survey of the Task Force's written records supports its members' testimony to this effect. While formal minutes of the Task Force meetings were unfortunately not taken, one of its members' extensive meeting notes were provided to the Court. They support the Task Force members' testimony as to what took place at the meetings, and the Court finds the testimony itself wholly credible.

Even assuming that the Task Force's work constituted Virginia's findings process, Mary Washington argues that the Task Force did not take into account "significant relevant factors" that might influence the costs that efficiently and economically run hospitals incur. Specific factors mentioned include wage variations among rural hospitals, sole community provider status, "case-mix" (the type and intensity of services provided), new and necessary services, unique and specialized services, and improvements based on previous certificate-of-need approvals.

The state's position is that the Task Force, with Arthur Young & Co.'s assistance, determined that hospital bedsize and the urban/rural distinction are adequate proxies for case-mix and other important variations between hospitals. The evidence supports the contention that the Task Force made such a determination. The Task Force started with a significantly longer list of possible factors that might be used in establishing the peer groups. With Arthur Young's assistance, the list was narrowed down to the two criteria ultimately chosen, along with an adjustment mechanism for the urban wage factor.

The expert testimony at trial was divided over the reasonableness of this determination, and the Court has no basis for rejecting the state's exercise of discretion here. The Task Force record evidences a good faith examination of the impact of several different versions of the plan on each participating hospital in Virginia, comparing the rate it had previously received under the "actual cost" system with the prospective rate it would receive under the plan being considered. Significant discrepancies were identified and, where adjudged appropriate, led to revisions. For example, this process apparently led to the decision to treat education costs as "pass-throughs." Generally, the Task Force appears to have given due consideration to the factors that came to its attention in its own study or in the public hearings process.

It would be inappropriate for the Court to determine what cost-influencing factors are significant enough that Virginia should have incorporated them into its rate-setting formula. This is the task Congress specifically left to the states when it said that rates should be "determined in accordance with methods and standards developed by the State ..." 42 U.S.C. § 1396a(a)(13)(A). A generalizing prospective payment system is inherently less precise than a system based on a hospital's actual costs. But both Congress and the Commonwealth have determined that the inflationary nature of the latter type of system justifies rejecting it in favor of the less precise but incentive-producing prospective methods.

■ Virginia agreed with Mary Washington that wage variations can be important determinants of differences in the costs of efficient hospitals, but it argued that the Task Force had taken them into account where the necessary data was available—for urban hospitals only. Mary Washington failed to show this decision to be arbitrary and capricious. It offered evidence that data on wage variations amongst rural *hospitals* were in fact available. This is factual, but not helpful: use of such data (as distinct from data on wage variations amongst rural *areas generally* )

clearly would have been inappropriate as Virginia attempted to move away from relying on hospitals' *actual* cost experience, with its built-in flationary tendencies. The unavailability of the necessary data is certainly a legitimate reason to decline to differentiate rates on a particular factor, so long as the rates ultimately set are reasonable and adequate. Relatively imprecise groupings or classifications are almost unavoidable in a large public health and welfare program such as Medicaid, and imprecisions may certainly be justified by the difficulty of developing a more precise system. *See Mississippi Hospital Ass'n. v. Heckler,* 701 F.2d at 519; *Weinberger v. Salfi,* 422 U.S. 749, 780, 95 S.Ct. 2457, 2474, 45 L.Ed.2d 522 (1975).

■ The Task Force members defended their choice of the medians (as opposed to the mean or some other percentile) for the prospective rate ceilings on the following rationale: if half of the hospitals in a grouping can operate at or below a certain level, then certainly an efficient and economic hospital could do so. Mary Washington argues that this implies that all hospitals above the median are uneconomical and inefficient, a conclusion for which the Task Force had no evidence.

Underlying this argument is the premise that a hospital is entitled under the new law to be recompensed its reasonable costs unless it is inefficient or uneconomical. This premise, in the Court's view, reflects a misunderstanding of OBRA of 1981. The legislation clearly is intended to allow states to engage in price-conscious "shopping" for hospital services for Medicaid recipients. If two hospitals in a given locality, for instance, offer the same quality services at widely disparate rates, the average consumer need not do an efficiency study before determining not to pay the higher-priced hospital's rate. VMAP may now set the rates it is willing to pay in much the same fashion. Notably, the drafters of OBRA of 1981 contemplated that the rates fixed in compliance with its provisions might not be sufficient to keep *every* hospital participating in the Medicaid

program. *See* 46 Fed.Reg. 47970 (September 30, 1981) (commenting on House Report 3982).

In this sense, then, Virginia is correct that the meaning of "efficient and economical" is largely left to the state to define. There are, of course, constraints on the extent to which the state can allow price to govern its "shopping." The rates it fixes must be adequate "to provide care and services in conformity with ... quality and safety standards [etc.] ..." 42 U.S.C. § 1396a(a)(13)(A). Mary Washington has not offered any convincing evidence or argument to challenge Virginia's determination that its rates were adequate on this ground. Additionally, the rates fixed must be adequate to assure "reasonable access," and on this ground Mary Washington would contend that the two-hospital-locality example relied on *supra* is irrelevant to its sole-community-provider situation. This contention will be addressed *infra.*

Next, Mary Washington argues that the Task Force's findings were arbitrary and capricious because they were compelled by overriding budgetary considerations rather than by evidence before the Task Force. The state offers both a legal and factual response to this suggestion, and the Court agrees with it on both.

■ Mary Washington relies on the pre-OBRA of 1981 case of *Alabama Nursing Home Association v. Harris,* 617 F.2d 388, 396 (5th Cir.1980) for the proposition that evidence of budgetary motivations for a proposed Medicaid change automatically render that change suspect. In 1983, after OBRA of 1981, the Fifth Circuit explained that "[the language in *Alabama v. Harris* ] should not be read to mean that states cannot consider cost efficiency in adopting reimbursement plans, or that courts should engage in some type of motivation analysis." *Mississippi Hospital Ass'n. v. Heckler,* 701 F.2d at 518. It is moreover clear from the legislative history of OBRA of 1981 that the efficient and economic standard was *"intended by Congress to reduce the level of reimbursement paid by the states for hospital inpatient services."*

*Charleston Memorial Hospital v. Conrad,* 693 F.2d 324, 331 (4th Cir.1982) (emphasis added). In light of this Congressional intent, it is fruitless to argue that Virginia's desire to cut its Medicaid budget somehow makes its actions pursuant to the new legislation suspect.

There were also indications in the legislative history of "Congressional concern that [relevant portions of OBRA of 1981] not be read as repealing the rate setting process and returning to pre-1972 reimbursement schemes which determined daily rates simply by dividing the annual budget allotment by the number of patient days." *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 463 (E.D.Mich. 1982). But the evidence is clear that Virginia's Task Force did no such thing. The Task Force had a fixed budgetary goal to achieve for the *entire* state Medicaid program, but unlike the state officials in *California Hospital Association v. Obledo,* 602 F.2d 1357, 1359 (9th Cir.1979), it did not have a fixed cap to force on to *hospital reimbursement.*

Additionally, by returning to the 1981 administration proposal to eliminate the medically needy from eligibility, the Task Force could probably have avoided affecting hospital reimbursement altogether. The Task Force members testified that that was an option to which they hoped they would not be forced to resort, but it was never out of the realm of possibility, should other cuts within the constraints of federal law not be adequate. Finally, the evidence is also clear, particularly from the Arthur Young worksheets prepared for the Task Force, that the Task Force evaluated several different versions of the prospective payment plan for their fairness to each and every hospital and not simply for the amount of money that would be saved under each. Had budget-cutting been the only goal, surely the version that would have saved the most would have been the final choice. In fact, it was not.

The Court is satisfied that Virginia established its new rates for 1982–83 at levels that "[fall] within a range of what could

be considered reasonable and adequate," which is, as HCFA has said, all that Congress has required. 48 Fed.Reg. 56049 (December 19, 1983).

Finally, Mary Washington contends that the only evidence in the administrative record relating to the effect of the budget cuts on the quality of care were statements from members of the Board of Health and state officials that they believed the cuts would harm the quality of care Medicaid patients received. In context, these statements do not support Mary Washington's case. They referred to the entire package of Medicaid cuts rather than specifically to the hospital reimbursement changes. Moreover, most of the ascribed remarks were made early in the spring of 1982, before the task force did its diligent and careful work of seeking out the least burdensome ways to make the cuts.

The only aspect of Virginia's new method of setting rates that is seriously troubling is the choice for the reimbursement escalator. As described *supra,* in future years the ceiling rates for each peer group will not be recalculated based on future cost experience, but will be merely updated via the general CPI. The Court understands the defendants' desire to avoid more hospital-specific inflation indices because of their tendency merely to reflect the inefficiencies and exponential cost growth that have beset the hospital industry in the past. However, Virginia's approach does not accommodate the possibility that some increase beyond the inflation rate may be justified, e.g. by technological developments or "new and necessary services" that increase the cost of efficiently providing quality care. Neither Congress nor the state has expressed a willingness to freeze the quality of care Medicaid patients receive at 1981 levels while the general public receives the benefits of new developments, but that is precisely the result the chosen escalator assumes. Virginia's only response to this problem is that the state plan is a flexible document, often amended—implicitly suggesting that it will be changed as necessary in future years.

■ This vague promise, though not an entirely satisfactory response, supports the Court's instinct that the potential future inadequacy of Virginia's rates under the current system is not now a properly justiciable issue. The Court has no evidence before it indicating that the rates set have already been outdated by general increases in operating costs due to technological advancements, etc.

Mary Washington has asked for injunctive as well as compensatory relief, but the Court has determined to exercise its discretion in equity to decline to resolve this problem unless and until the dispute crystalizes. If technological developments do not occur, or occur but without a significant effect on operating costs, or if Virginia adapts its system as necessary in future years, the Court will not be called on to decide the issue.

*"Reasonable Access" Standard*

Federal law and regulations require Virginia to reimburse hospitals at rates which it finds are "reasonable and adequate .... to insure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality ..." 42 U.S.C. § 1396a(a)(13)(A). Mary Washington contends that Virginia failed to make the requisite finding to this effect and that it moreover had no reasonable basis before it for such a finding.

■ As to the findings issue, most of the discussion regarding the "efficiency and economy" finding applies here as well. There was no written finding, nor was there a formal study by Arthur Young & Co. of the effect of the new rates on access issues. But, as Virginia correctly argues, the Medicaid Task Force itself undertook the necessary study and made the necessary finding as it diligently (although not formally) studied the impact of various proposals in light of its equally diligent study of the federal requirements.

Mary Washington correctly points out that the task force did not consider includ-

ing a "sole community provider" provision in its plan. However, as mentioned previously, "Sole Community Provider" status is a creation of *Medicare's* own new prospective payment system. Nothing in the federal *Medicaid* legislation or regulations require states to use such a status in their Medicaid programs or even to consider whether to use it. The "reasonable access" standard in the Medicaid legislation is a more general and flexible way of addressing the same problem, and the states need only adhere to it. A state may choose to satisfy the reasonable access standard through a "sole community provider" provision, but it need not do so.

Virginia did not take the sole community provider route. Instead, the Task Force extensively reviewed the impact of the various versions of the plan on *every* hospital in the system, considering *inter alia* their geographic locations and the population base of Medicaid patients. The Court found the testimony of Task Force members to this effect credible. The number of hospitals on the list is not so great, nor Virginia so large, that a panel of persons well-informed about the hospital industry in Virginia could not have made adequate individualized judgments of this sort. Having made these individualized determinations that the effect of the new rate system on the hospitals would not be undue or have serious consequences on patient access, the Task Force had no need of a general rule to deal with the problem.

There is no evidence that the task force was wrong in its judgment that its new rates were adequate to assure reasonable access. Mary Washington has suggested that it may some day be forced to withdraw from the Medicaid program, but there is no reason to believe that such a result is likely or eminent. In fact, the evidence is to the contra, *i.e.* that Mary Washington financially needs Medicaid as much as Medicaid needs Mary Washington.

The evidence, in fact, is that the number of hospitals participating in Virginia's Medicaid program has *grown* since 1982. There was moreover no evidence of any hospital in Virginia going bankrupt or withdrawing from the Medicaid program because of the changes. *Cf. Illinois Hospital Association v. Illinois Department of Public Aid,* 576 F.Supp. 360 (N.D.Ill., 1983) (Medicaid cuts were so severe that numerous hospitals' financial stability was jeopardized).

The "reasonable access" standard makes sense as a separate test from the "economy and efficiency" standard only if interpreted in the context of Congress's expectation that, under some states' new systems, rates might be low enough that hospitals might actually withdraw from the Medicaid program. If all the hospitals that had participated in Medicaid under the full-cost-reimbursement method stay in under the new prospective system, presumably then there is reasonable access. In giving states more flexibility in rate-setting, Congress felt the need to add the "reasonable access" constraint so as to prevent the states from lowering their rates so much that a dangerous number of hospitals, or single medically important hospitals, might withdraw from the program.

That this was the Congressional concern underlying the "reasonable access" constraint is revealed in the following passage from the comments to HCFA's September 30, 1981 publication of regulations:

The report on H.R. 3982 states the expectation that payment levels for inpatient services will be adequate to assure that a *sufficient number of facilities providing a sufficient level of services* actively participate in the Medicaid program to enable *all* Medicaid beneficiaries to obtain quality inpatient services. This report further states that payments should be set at a level that ensures the active treatment of Medicaid patients in a *majority* of the hospitals in the state.

46 Fed.Reg. 47970 (emphases added).

The Court is satisfied that Virginia's rates are within the requisite range of reasonableness and adequateness to meet the reasonable access standard understood in this light. The Court is further satisfied that the Task Force made sufficient find-

ings based on sufficient evidence to this effect.

*Appeals*

While the Court has determined that the general rates Virginia has set for hospital reimbursement are not in conflict with the governing federal law, this conclusion does not, mean, however, that those general rates will be adequate in every case. For a variety of reasons, reasonable *general* rates may not be reasonable and adequate in *particular* cases to assure reasonable access and to cover the costs of efficiently and economically running a hospital. This may be due to some special fact about a hospital or group of hospitals that the state did not take into account in setting the general rate. Or, although a general rate may originally have been adequate for a given hospital, it may become inadequate when technology or other circumstances necessitate a change in the services being provided.

Whatever the reason, the appropriate way to deal with this problem under a prospective payment system such as Virginia's is through some form of appeals or exceptions process. In fact, the more general the rate-setting system is, the stronger the need for some appropriate method of accommodating particular situations that the general rules do not adequately address. Under Virginia's old method of reimbursing actual, allowable costs, a detailed, intricate set of rules that took into account almost every conceivably relevant consideration had been developed. Under Medicare's new DRG system an almost equally elaborate system has been developed. Hence, an appeals process that limits consideration on appeal to the application of those intricate rules is likely to be adequate. If, at the other extreme, a state fixed a single reimbursement rate across the state, there would almost certainly be a need for a broader form of appeal or exception process that would allow individual hospitals relief from the general rule.

On the other hand, if the appeals process is too broad and open, it could effectively be a way for hospitals to seek "actual cost"

reimbursement and to avoid the incentives and simplicity of the prospective payment system, as the defendant's expert testified.

What is needed—and furthermore what the federal regulations require—is something in-between, designed by the state to complement its rate-setting system by allowing hospitals to raise potentially relevant special factors without opening itself up to frivolous appeals.

The requirement that the states develop their own appeals process first appeared in interim final rules which HCFA issued on September 30, 1981 to implement OBRA of 1981. The regulation stated:

> The agency *must* provide an appeals procedure that allows individual providers an opportunity to submit additional evidence and request prompt administrative review of payment rates.

42 C.F.R. § 447.258 (emphasis added).

HCFA explained this section in the accompanying comments as follows:

> We believe that *individual* facilities must be given some opportunity to request review and adjustment of their rates.

46 Fed.Reg. 47968–47969 (September 30, 1981) (emphasis added). The HCFA comments went on to note that some approach other than an appeals process might be able to achieve the purpose of giving individual facilities an opportunity to request review and adjustment of their rates, and it invited comments on these issues, pending issuance of the final rules. *Id.*

In response to the comments received, HCFA promulgated clarifying instructions on December 19, 1983. The appeals requirement, as recodified and revised, now reads as follows:

> The Medicaid agency must provide an appeals *or exception* procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, *with respect to such issues as the agency determines appropriate*, of payment rates.

42 C.F.R. § 447.253 (1983) (emphasis highlighting new language).

The revision, analysed in light of the accompanying comments, was not intended to abolish the requirement for a meaningful appeals process. HCFA declined to follow suggestions that it establish minimum criteria setting forth situations in which a rate may be appealed, or establish a penalty clause for frivolous appeals, on the grounds that the states should be allowed the flexibility "to determine the administrative process that would ... be most compatible with their reimbursement system." 48 Fed.Reg. 56052 (December 19, 1983). "However," HCFA continued, "states are free to establish *reasonable* criteria for appeals to limit the issues on appeal that may be appropriate or to adopt other procedures to prevent frivolous appeals." *Id.* (emphasis added).

HCFA also declined to follow a suggestion from one state agency that the appeals process be waived in states with uniform statewide rates. HCFA responded that "we have clarified the regulation to allow states employing uniform statewide rates to adopt the administrative process for reconsideration or appeal that would be most compatible with their reimbursement systems." *Id.* Clearly, however, HCFA intended that the state must make some such process available.

Virginia contends, with heavy reliance on the "such issues as the agency determines appropriate" language in the 1983 version of the regulation, that it has incorporated all the issues it deems "appropriate" into the rate-setting mechanism itself—e.g. the special provisions for hospitals with a disproportionate number of Medicaid patients and with high-intensity neo-natal care. In essence, Virginia attorneys argue that Virginia would deem appeals on any other ground to be frivolous.

The most obvious and serious problem with this argument is that it· is simply that—argument of lawyers unsupported by any evidence in the record that the informed agency officials determined that all appeals on other grounds would be frivolous. In fact, the evidence is convincing that the Task Force and other agency deci-

sion-makers simply overlooked the appeals process. When the state sent HCFA its proposed amended plan, no appeals provision was included. When HCFA specifically requested information on the appeals process, Virginia apparently hastily retrieved the appeals provision left over from its abandoned "reasonable cost" rate system and submitted it to HCFA with no apparent consideration of its suitability to the new system.

This appeals provision states little more than that hospitals can appeal the application of the principles of reimbursement but they cannot appeal the principles of reimbursement themselves. As Virginia has interpreted it, this means that a hospital could appeal only on, e.g., whether it was properly categorized as outside an SMSA and hence rural instead of urban. Evidence that a particular hospital's costs were high for its peer group because of special, necessary, and expensive services which it alone offered could not justify any relief, even partial, from the general rate under this interpretation. Likewise evidence that a hospital's costs were higher than those of its peer group for reasons beyond its control would not get a hospital any additional reimbursement under Virginia's system, even if that hospital's participation in the Medicaid program was crucial to ensure certain Medicaid recipients "reasonable access" to hospital services.

██ The Court is satisfied that Virginia's appeals provision, as interpreted, is unreasonably and arbitrarily narrow. Even VMAP's Director Bruce Koslowski, who served on the Task Force and is a defendant here, appears to have recognized this. In seeking HCFA's approval of the plan, he assured HCFA in writing that Virginia's plan "does provide for appeals in situations of a typical case mix, et cetera." Mr. Koslowski acknowledged in his testimony that this is simply not accurate. Counsels' efforts to give his words a plausible-but-accurate construction, which he himself could not do, were not convincing.

The fact is that no one in Virginia's Medicaid agency has ever made a determi-

nation as to what issues should or should not be appealable or otherwise as to what form of appeals or exceptions provision is appropriate under the new plan. The determinations they made on what factors should be incorporated into the *general* rate-setting mechanism are no substitute.

The federal regulations require the defendants to devise an appeals process based on their reasoned, reviewable judgment on these questions. This they have not yet done. Accordingly, the Court will direct the defendants to do so now. The Court will not attempt to dictate to them what type of appeals provision should be adopted or to fix a minimum list of issues that should be appealable. HCFA correctly points out that Congress intended that the states be free to make their own reasoned determinations on these questions. 48 Fed.Reg. 56052 (December 19, 1983).

However, the Court does suggest, that if the defendants choose to limit appeals to a finite list of issues, they may want to *consider* the appropriateness for inclusion in the list of each of the factors Mary Washington has raised. Now that those factors have been suggested in this litigation, agency officials seeking in good faith to devise a reasonable appeals provision should want at least to give independent, open-minded consideration to the appropriateness of allowing appeals on any or all of those factors. Though the task may be difficult, the Court is satisfied that the agency officials will be able to distance themselves from the arguments their legal advocates, fulfilling their role as such, have been making about those factors and to apply their own expertise, knowledge, and judgment as the law requires.

The Court suggests further, hopefully as a matter of assistance, that the agency may want to consider the variety of appeals techniques referred to in 48 Fed.Reg. 56052 (December 19, 1983) and utilized in the plans adopted in other states (and submitted as exhibits herein). From amongst those numerous ideas, the Court is confident the state will be able to protect itself against frivolous appeals or an unmanageable system while still ensuring a meaningful appeals process.

■ One more note on the remedy is in order: Mary Washington has asked the Court to order the state to make any appeals granted work retroactively. The Court deems fairness dictates that that is appropriate in a narrow sense. It will direct the State to develop a new appeals process, to seek approval of it from HCFA, and then to make the appeal process *available* to Mary Washington.

Once the appeals procedure is implemented, Mary Washington shall be able to invoke that procedure for decisions made from July 1, 1982 until the procedure is in fact implemented. Any such appeal by Mary Washington shall be conducted and governed pursuant to the new appeals rules and procedures in the same manner as if the process had been in effect since 1982. Any relief that may result from a successful appeal, however, shall be limited to relief calculated only from the time the appeal would have been favorably decided had the appeals procedure been available from 1982.[1] The Court, though satisfied under the specific facts of this case that fairness dictates its holding, is not prepared to require the adoption of an appeals mechanism which would award retroactive relief to successful appellants.

Obviously, if the state decides in designing the new appeals process that retroactive relief should be granted to a successful appellant, it is free to do so.

Nevertheless, in preparing its appeals process it should be free from Court ordered specifics.

---

1. The Court recognizes that there will inevitably be some uncertainty as to when a favorable decision on a hypothetical appeal made sometime in the past would have occurred. The parties will have to resolve this issue once it becomes ripe. It may be that no problem will arise; thus, the Court shall not at this time devote its resources to a problem that may not exist (or that, if it does exist, may be more intelligently addressed by the parties with the relevant facts at hand than by the Court).

HCFA, in response to a suggestion that the federal regulations require such retroactive relief, determined that, in light of the Congressional intent to give the states maximum flexibility, such a requirement would be inappropriate. The Court agrees. Like HCFA, the Court "believe[s] that fair and reasonable rate adjustments are implicit in an appeals process," 48 Fed.Reg. 56052 (December 19, 1983), but the task of deciding whether "fair and reasonable" necessarily implies "retroactive" must be left, at least initially, to the states.

### CONCLUSION

 Mary Washington has suggested that if any portion of the state plan falls, then the whole plan falls with it. No logical or legal reason for this result has been offered. The appeals procedure is logically distinct from the remainder of the plan, which the Court has adjudged adequate. The deficiency in the appeals process may be entirely remedied by making the new appeals process retroactively available to Mary Washington for the years past.

Accordingly, the Court will uphold Virginia's Medicaid plan in its entirety except for the appeals process, as to which the Court will return the matter to the state for further consideration and revision.

Counsels' prayer for counsel fees will be DENIED.

Plaintiff will recover its taxable costs.

An appropriate order will issue.

### FINAL JUDGMENT ORDER

For the reasons stated in the Memorandum this day filed and deeming it proper so to do, it is ADJUDGED and ORDERED as follows:

The Court declares that the Commonwealth of Virginia's Medical Assistance Program now in effect, excepting for its lack of a meaningful appeals process, is not violative of law.

Defendants shall, within sixty (60) days of this date, formulate (and seek approval of same, from the appropriate federal authority), an appropriate and meaningful appeal or exception procedure to be utilized in the Virginia Medical Assistance Program. Said procedure to be effective immediately upon receipt of approval of the U.S. Secretary of Health and Human Services or his designee.

This action stands dismissed with leave to plaintiff to petition, for good cause shown, to reopen same for purposes of effectuating the requirements of this decree.

Plaintiff is entitled to its taxable costs.