COLORADO HEALTH CARE ASSOCIATION; Geriatrics, Inc.; Miller Nursing Home, Inc., d/b/a Fairview Care Center; Springs Village, Inc., d/b/a Springs Village Recovery Center; W II, Inc., d/b/a Glen Ayr Health Center; North Shore Manor, Inc.; and Evergreen Care Centre, Ltd., Plaintiffs–Appellants,

v.

COLORADO DEPARTMENT OF SOCIAL SERVICES; George S. Goldstein, in his official capacity as Acting Executive Director of the Department of Social Services; Colorado State Board of Social Services; Gilbert R. Slade; Nona Thayer; Felix S. Cordova; Thomas C. Hickman; Mark E. Notestine; Larry Velasquez; Sharon L. Hill; James E. Martin; and Florangel Mendez, in their official capacities as members of the Colorado Board of Social Services; and the State of Colorado, Defendants–Appellees.

No. 85–1016.

United States Court of Appeals, Tenth Circuit.

Feb. 22, 1988.

Frederick Miles, Miles & McManus, Denver, Colo. (Richard G. McManus, Jr., Miles & McManus, Denver, Colo., was also on the brief), for plaintiffs-appellants.

Wade Livingston, Asst. Atty. Gen., Denver, Colo. (Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen. and Richard H. Forman, Sol. Gen., Denver, Colo., were also on the brief), for defendants-appellees.

Before HOLLOWAY, Chief Judge, and BARRETT and SEYMOUR, Circuit Judges.

HOLLOWAY, Chief Judge.

The plaintiff-appellant Colorado Health Care Association appeals from the dismissal of its complaint which challenged a reduction in reimbursement paid by the State of Colorado (State) to providers of long term nursing services to Medicaid pa-

tients. The services are provided as authorized by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 to 1396p and the Colorado Medical Assistance Act (Medicaid), Colo.Rev.Stat. §§ 26–4–101 et seq.

The association is a not-for-profit corporation comprised of operators of long-term nursing facilities; other appellants are entities who either own, lease, operate or manage such facilities and are certified to provide services under the Colorado Medicaid program (hereinafter "appellants" or "providers"). The appellants challenged the repeated suspension or elimination of the "incentive allowance" component of the daily rate paid by the State to nursing homes which provide services to Medicaid patients. The district court dismissed their complaint. *Colorado Health Care Association v. Colorado Dept. of Social Services*, 598 F.Supp. 1400 (D.Colo. 1984). This timely appeal followed. We find the district court's opinion persuasive and affirm.

## I.

### A. Colorado Medicaid Reimbursement Plan

The central issue is whether the State's decision to amend its Medicaid plan so as to eliminate the payment of the incentive allowance resulted in violation of the Medicaid standards mandated by the Boren Amendment. Codified within 42 U.S.C. 1396a(a)(13)(A)(1982), the Boren Amendment of 1980 requires that a state reimburse service providers under rates which are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity

with applicable state and Federal laws, regulations and quality and safety standards. *Id.* (Effective October 1, 1980).[1]

Under the Colorado Medicaid plan, the State pays certified nursing homes for their services to qualified Medicaid patients on a daily rate, paid per patient per day (PPD). The Colorado Department of Social Services (DSS) is the State agency which administers the Medicaid program. DSS establishes a PPD rate for individual nursing homes. The rate is prospective and based on historical costs for all certified and participating nursing homes for the preceding reporting period of six months. The reimbursement rate is adjusted every six months.

The overall PPD rate for each participant provider is calculated and determined by two components: administration costs and health care costs. Administration costs which are reimbursable or allowable under state law include the expenses incurred with the administration of the nursing home, property, and room and board. Health care costs are not included in the calculation of the incentive allowance at issue. Colo.Rev.Stat. § 26–4–103(4.5).

The administrative costs are the basis for the incentive allowance and are subject to a maximum reimbursement formula or ceiling.[2] This ceiling is statutorily defined within "Reasonable cost of services" as "the actual costs of ... administration, property and room and board costs excluding food costs, to the ninetieth percentile of medicaid patients" residing in participating facilities. *Id.* The reasonable cost or ninetieth percentile is based on the reported costs of medicaid patients in all participating nursing homes in the State. These costs are audited and reviewed in the six-

1. The amendment was part of the Omnibus Reconciliation Act of 1980, which intended to effect reductions throughout the existing federal budget. *See* Report of the House Budget Committee on the Omnibus Reconciliation Act of 1980, House Report No. 96–1167, 96th Cong., 2d Sess. at 1; reprinted in 1980 U.S. Code Cong. & Admin.News 5526, 5527. Prior to the 1980 amendment, the states were required to determine reimbursement rates "on a reasonable cost-related basis, as determined in accordance with methods approved and verified by the Secretary

[of Health and Human Services]." 42 U.S.C. § 1396a(a)(13)(E) (reasonable cost standard) (codified as amended at 42 U.S.C. § 1396a(a)(13)(A)).

2. During the course of this litigation § 26–4–103 (4.5) was amended to also limit maximum reimbursement of health care services and food costs to the ninetieth percentile. Colo.Rev.Stat. § 26–4–103(4.5) (Supp.1987). That limitation is not at issue here.

months period being used to establish a new rate.

During the times material to this case, the incentive allowance was calculated on the difference between the ceiling rate of 90% and the nursing home's administration cost rate. This incentive factor was further limited in that it could not exceed twelve percent of the ceiling rate, that is, the ninetieth percentile. Added to this incentive allowance is the inflation allowance, based on the consumer price index, which takes into account the increases in costs that occur between the time the costs are incurred and the time the rate is paid. IV R. TR 103–104. The historical costs for administration and health care are subject to the statutory limits on components which will be recognized as reimbursable elements.[3]

As to the administration cost, the calculation of that PPD rate can be stated as:

$$\frac{\text{actual costs limited by statute}}{\text{patient days}} + \begin{array}{c}\text{incentive allowance}\\ \text{(if costs below}\\ \text{ninetieth percentile)}\end{array} + \begin{array}{c}\text{inflation factor}\\ \text{(based on}\\ \text{consumer price}\\ \text{index)}\end{array} = \begin{array}{c}\text{PPD}\\ \text{(Per Patient rate}\\ \text{paid \underline{Daily} to}\\ \text{service provider)}\end{array}$$

If a nursing home's costs exceed the ninetieth percentile costs, then the DSS calculates the rate based upon the ninetieth percentile or reasonable costs rather than the nursing home's actual allowable costs. Colo.Rev.Stat. § 26–4–103(4.5), and § 26–4–110(5)(a). If a nursing home's actual allowable costs are below the ninetieth percentile, the department will increase the nursing home's rate by adding an incentive allowance to their actual costs. At the times in question here, the incentive allowance was initially calculated as 50 percent and after 1984 as 25 percent[4] of the difference between the ninetieth percentile and the nursing home's actual costs. IV R. TR 51–104–106.

### B. Administrative and Procedural History

The DSS has at five times adopted a rule which temporarily suspended the payment of the incentive allowance to those nursing homes whose administrative costs were below the ninetieth percentile. Initially, the decision or informal rule suspending this payment was made by the Colorado Board of Social Services (CBSS) within the DSS. After public hearings on January 7, 1983 and February 4, 1983, at its regular meeting on February 4, the CBSS adopted, on an "emergency basis" an amendment to its long-term care reimbursement regulations. This change eliminated payment of the incentive for services rendered from April 1, 1983 to May 30, 1983 and from May 30, 1983 until June 30, 1983 because of a projected $24 million shortage in Medicaid funds. Plaintiffs' Exh. 1. The State stipulated that the denial of this component of the PPD was "due strictly to a 'lack of available appropriations.'" I R. 127, ¶ 4.

The appellants filed this suit in state court and the case was removed to federal court on the appellees' petition; jurisdiction arises from the federal question, pursuant to 28 U.S.C. §§ 1331, 1441. I R. 1–23. Subsequently, the Governor of Colorado approved a supplemental appropriation act which made funds available to pay the incentive allowance. Plaintiffs' Exh. 3, S.B. 273. In S.B. 273, $755,662 was appropriat-

---

**3.** The calculation of the individual provider's rate involves a history of statutory changes as to the costs which are allowable and reimbursed and the mathematically derived ceilings and limitations. *See* 1973 Colo.Sess.Laws Ch. 340, section 1, p. 1200; 1977 Colo.Sess.Laws Ch. 372, sections 2, 4, pp. 1352, 1353; 1982 Colo.Sess. Laws, Ch. 112, sections 2, 3, p. 431; 1984 Colo. Sess.Laws Ch. 219, section 1, p. 794; 1984 Colo. Sess.Laws, Ch. 222, section 1, p. 797. The par-

ties have addressed this statutory history and argued that the underlying rationale for the reimbursement method is material to their claims and defenses. We consider this history only as it bears upon any dispositive issue.

**4.** In 1984 this percent was reduced to 25 percent. Colo.Rev.Stat. § 26–4–110(5)(c) (1987 Supp.).

ed from general funds with the purpose as stated: "Restores one-half of the nursing home incentive payment for the last half of the year [1982–1983, the 1983 fiscal year]." Plaintiffs' Exh. 4 at line 22.

After the Governor's signing of S.B. 273, the DSS adopted an emergency regulation which reinstated the incentive allowance. Under this amendment to the rule adopted on February 4, the DSS informed providers that it would reimburse them for "up to 62 days of foregone incentive." Plaintiffs' Exh. 6. Thereafter, the parties executed a stipulation which was approved by the district court providing for the reinstatement of payments to the appellants.

The second suspension of the incentive payment occurred after the Governor vetoed the appropriation for the incentive allowance in the general appropriation bill for fiscal year 1983–84. This appropriation was to pay the incentive which remained unpaid for 1982–83. Plaintiffs' Exh. 8, S.B. 401. DSS did not pay the incentive allowance beyond the 62 day period, *supra*, and notified providers that the incentive allowance would not be paid for the period from April 6 to June 30, 1983. Plaintiffs' Exh. 9. A fiscal year commenced on July 1, with Medicaid appropriations for 1983–1984, the 1984 fiscal year.

On July 18 and 19, 1983, a hearing was held on appellants' motion for an order to show cause why the DSS should not pay the incentive allowance for the last portion of 1983 fiscal year. Upon conclusion of the hearing, the parties agreed to consolidate it with a trial on the merits pursuant to Rule 65(a)(2), Fed.R.Civ.P.

On May 4, 1984 the CBSS suspended the incentive payment for the third time, enacting an emergency rule in order to "only pay the incentive allowance to nursing homes with available appropriations specifically appropriated" for this purpose. II R. 249, Supplemental Complaint, Exh. A at 254. Providers were denied the incentive payment for services rendered from June 1, 1984 to June 30, 1984. After the third suspension, the parties made further stipulations and the complaint was supplemented to include the second suspension and derivative claims. II R 249. On December 5, 1984, the district court dismissed the complaint.

During the pendency of this appeal, the appellants have supplemented the complaint to include claims based on the fourth and fifth suspensions of the incentive allowance. On or about August 1, 1986 the CBSS eliminated the payment for the service period commencing August 1 through November 30, 1986. Supplemental II R. at 22–24. On December 5, 1986, the CBSS similarly eliminated the payment for the service period commencing December 5, 1986 through June 30, 1987.

CBSS has in all instances amended the reimbursement plan through its emergency rule making power. The rule has repeatedly been stated as necessary because of projected deficits in the overall Medicaid budget and, with regard to the incentive allowance, the lack of available appropriations. The record shows that the first and third rules were submitted to the federal Secretary (Secretary) of Health and Human Services (HHS). The Secretary accepted the amended rules with the accompanying assurances and subsequently formally approved the rules. II R 279–283.

■ The appellants argue that the district court erred in finding the State's actions are lawful under federal and state law because (1) the elimination of this specific payment is a reduction in providers' overall payment effectuated solely for budgetary reasons and therefore proscribed by federal law, despite the Secretary's approval of the State's action; (2) the State's emergency rules to effect the reduction were not enacted in conformance with the Colorado Administrative Procedure Act (CAPA), Colo.Rev.Stat. § 24–4–103; (3) the State's agency, DSS, lacked the statutory authority to enact the emergency regulation to effect the payment reduction; and (4) the State is barred by contract and equitable principles from denying payment which appellants have earned. In addition, on appeal the State asserts that it did not waive its Eleventh Amendment immunity

so as to subject the state to retroactive relief, if appellants prevail.[5]

## II

### Standard of Review

■ With respect to their claims of invalidity of the State's action under both federal and State law, the appellants argue that we should apply the higher standard whether the State's action was supported by substantial evidence. We disagree and apply instead the standard whether the State's action was arbitrary and capricious and in accord with law.

■ The Colorado Medicaid reimbursement plan results from legislative and policy decisions made at both the federal and State level. Our review is limited. Our task is only to determine whether the agency conformed with controlling statutes. *See Baltimore Gas and Electric Co. v. Natural Resources Defense Fund,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971). We can determine whether federal law has been violated. Here we consider the Social Security law and whether the State in amending its payment method for the incentive allowance has complied with the requirements for states which choose to participate in the Medicaid program. While participation in the Medicaid program is optional, once a State elects to participate, it must comply with federal statutory requirements. *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980).

■ In a review of informal agency action, the Court is limited to deciding whether the action is arbitrary and capricious. *Overton Park,* 401 U.S. at 413–414, 91

S.Ct. at 822; *Baltimore Gas,* 462 U.S. at 106, 103 S.Ct. at 2257; *Anderson v. U.S. Dept. of Housing And Urban Development,* 701 F.2d 112, 113 (10th Cir.1983); *Mississippi Hospital Association Inc. v. Heckler,* 701 F.2d 511, 516 (5th Cir.1983). The appellants claim district court error in light of the requirements of the Colorado law, the CAPA, for which the arbitrary and capricious standard is also applicable. Under Section 24–4–106(7) of the CAPA, which prescribes the bases for setting aside agency action, the statute does not distinguish between rulemaking and adjudicatory functions of agencies for purposes of judicial review. The Supreme Court of Colorado has determined that for purposes of judicial review of *informal* rulemaking, the arbitrary and capricious standard tends to merge with the substantial evidence standard. *Citizens for Free Enterprise v. Dept. of Revenue, State of Colorado,* 649 P.2d 1054, 1062 n. 6 (Colo.1982). The key question during judicial review is whether the agency action is reasonable and supported by the record before the court. *Id.* (citing K. Davis, *Administrative Law Treatise* § 29.00–1 at 528 (1982 Supp.)); *Anderson,* 701 F.2d at 115 ("The controlling test is whether the record facts supporting agency action are adequately adduced and rationally applied"). "The court is not empowered to substitute its judgment for that of the agency." *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 824.

■ A presumption of validity attaches to the agency action and the burden of proof rests with the appellants who challenge such action. *Mississippi Hospital,* 701 F.2d at 516; *see also Overton Park,* 401 U.S. at 415, 91 S.Ct. at 823. The same presumption of validity applies to a state agency as to a federal agency. *Mary*

---

5. The appellees have raised the issue whether the appellants, as nursing home operators, have standing to challenge the amended rules on behalf of Medicaid recipients. Here the argument lacks merit. In similar cases the federal courts have permitted providers to bring actions to enforce the Medicaid statutes. *Edgewater Nursing Center Inc. v. Miller,* 678 F.2d 716 (7th Cir.1982), *Minnesota Ass'n of Health Care Facilities v. Minnesota Dept. of Public Welfare,* 602 F.2d 150 (8th Cir.1979), 742 F.2d 442 (8th Cir.

1984) *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *California Hospital Ass'n v. Obledo,* 602 F.2d 1357 (9th Cir.1979); *Massachusetts General Hospital v. Weiner,* 569 F.2d 1156 (1st Cir.1978); *National Union of Hospital and Health Care Employees, RWDSU, AFL–CIO v. Carey,* 557 F.2d 278 (2d Cir.1977). We agree with these courts in recognizing that Medicaid patients and health-care providers have parallel interests with respect to Medicaid funding and reimbursement.

*Washington Hospital, Inc. v. Fisher,* 635 F.Supp. 891, 897 (E.D.Va.1985). If the appellees have met the specific requirements of federal and state law, then we must defer to the agency's exercise of discretion unless the DSS acted arbitrarily or capriciously. *Id.; Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823; *Mississippi Hospital,* 701 F.2d at 516.

## III

### Federal Statutory Requirements

#### A. Congressional Intent

█ Our first inquiry is whether the payment to the appellants after DSS suspended one component, the incentive allowance, resulted in noncompliance with the federal statute and regulations. This issue is ultimately determinative of all the appellants' claims. This is our first occasion to determine whether a change in one component of compensation to providers causes a violation of the Medicaid statute.

Title XIX of the Social Security Act, as amended, provides:

A state plan for medical assistance must ... provide ... for payment of the skilled nursing facility services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations and quality and safety standards and to assure that individuals eligible for medical assistance

have reasonable access ... to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each skilled nursing or intermediate care facility and periodic audits by the State of such reports.

42 U.S.C. § 1396a(a)(13)(A); P.L. 96–499, § 962(a) (1980); P.L. 97–35, § 2173(a)(1)(B)(C) (1981). The Boren Amendment provisions are underlined. HHS subsequently promulgated regulations implementing the new federal statutory standard. *See* 42 C.F.R. § 447.250 to .280.

The Boren Amendment of the Omnibus Reconciliation Act of 1980 (OBRA), incorporated into the statute quoted above, had two purposes: first, that the states set their own reimbursement rates without stifling and expensive federal oversight of the methodology used; and, second, that Medicaid expenses be reduced by allowing the states to develop payment systems which would encourage efficiency. *Nebraska Health Care Association v. Dunning,* 575 F.Supp. 176, 178 (D.Neb.1983). The Congress moved away from payments determined by the "reasonable cost-related basis", also called the medicare standard, to rates which would be determined in accordance with methods and standards to be developed by the states.[6] The statute mandated a significant change in the basis for payment as well as the procedures to be followed by the state and federal agencies. The states would no longer be required to follow complex procedures of review and approval by the Secretary of HSS. *See Mississippi Hospital,* 701 F.2d at 515 (states to freely experiment with methods and standards which would be simpler and

---

**6.** The Senate Report accompanying the amendment stated:

The committee continues to believe that states should have flexibility in developing methods of payment for their medicaid programs and that application of the reasonable cost reimbursement principles of the medicare program for long-term care facility services is not entirely satisfactory. These principles are inherently inflationary and contain no incentives for efficient performance. S.Rep. No.

96–471, 96th Cong., 2d Sess., reprinted in 4 Medicare and Medicaid Guide ¶ 24,407, at 8780–81 (CCH) (1981). *See also Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 455–456 (E.D.Mich.1982) (federal legislative history); *Wilmac Corporation v. Heckler,* 633 F.Supp. 1000, 1007 (E.D.Pa.1986) (Boren amendment instituted a "lower standard" for reimbursement within statutory compliance).

less expensive than complex Medicare reasonable cost formula).

The judicial interpretation of congressional intent regarding the Boren and OBRA amendments has generally focused on the two purposes of the legislation outlined above. "Probing beyond this bottom line to the underlying rate setting methodology is not required under the new standard." *Coalition of Michigan Nursing Homes, Inc. v. Dempsey,* 537 F.Supp. 451, 459 (E.D.Mich.1982); *accord Mississippi Hospital,* 701 F.2d at 521; *Nebraska Health Care,* 575 F.Supp. at 178; *Illinois Hospital Association v. Illinois Department of Public Aid,* 576 F.Supp. 360, 369 (N.D.Ill.1983); *Children's Hospital of Philadelphia v. Secretary of Department of Public Welfare,* 568 F.Supp. 1001, 1007 (E.D.Pa.1983). In contrast to earlier provisions in the law that required the States to adopt inflationary and complex methods of reimbursement, "[the Boren Amendment] permits and encourages States to develop simpler, more efficient ways of paying for nursing home care, including budget-based and negotiated rates." *Nebraska Health Care,* 575 F.Supp. at 178 (citing 126 Cong. Rec. S8927 (daily ed. June 30, 1980) (statement of Senator Boren)); *Alabama Hospital Association v. Beasley,* 702 F.2d 955, 958 (11th Cir.1983); *see also Illinois Hospital,* 576 F.Supp. at 368 n. 11 (OBRA standard also applies to hospitals providing services to Medicaid recipients).

The State submitted its overall Medicaid plan to the Secretary, received approval, and thereafter was bound to follow the regulations which prescribe how a state operates its plan. When a state wishes to make a significant change in its methods and standards for determining the reimbursement rate, it must submit assurances and related information to HHS. 42 C.F.R. § 447.253 and .255. The related information includes the amount of the average proposed payment rate for each type of provider and the amount that payment will be increased or decreased, the estimated effects, short-term and long-term of rate changes on availability of services, type of care furnished and extent of provider participation. *Id.* at (a), (b).

If HSS does not notify the state within 60 days that its assurances regarding a proposed payment rate are unacceptable, then the assurances will be deemed accepted. 42 C.F.R. § 256(b). Where the state's proposed rate has been accepted or deemed accepted by HHS, the rate will be effective on the date specified in the agency's assurances. However, the effectiveness date cannot begin before the first day of the calendar quarter in which the agency submits the assurances and related information. *Id.* at (c).

## B. Appellees' Amendment of Payment Plan

At issue is whether the State complied with the procedures for amending and whether the result of the amending procedures kept the State's overall reimbursement within the requirements of a reasonable and adequate payment which promotes efficiency and economy in the providers' operations. The district court found that DSS had submitted the first and third rules suspending the incentive payment as amendments, with assurances, to the Secretary who accepted and approved these changes.

The Secretary's approval was not required before the State's agency, DSS, could implement the change. *See* 42 C.F.R. § 256; *Illinois Council,* 579 F.Supp. at 1145. This expedited approach implements the congressional intent that the Secretary and HHS will not overburden the states and facilities with unnecessary and burdensome paperwork requirements. *See* S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S.Code Cong. & Ad.News 396, 744; *Mississippi Hospital,* 701 F.2d at 520. The record supports the district court's finding that procedurally and substantively the appellee complied with the requirements of the Social Security Act.

The appellants argue that deference should be denied to the HHS determination that the State's proposed amendments met statutory requirements because HHS failed to provide a record of the scope and nature of its review. Appellants' Brief at 29–33.

Appellants say that since the State failed to provide either "proper or adequate assurances" to HHS, the federal agency review failed to consider the requisite factors and to explain its determination which, therefore, precludes a meaningful judicial review. *Id.* at 32. We disagree.

The district court did not merely rely on deference to the HHS determination but, in fact, considered whether DSS submitted the amendment as procedurally required by the regulations and whether the approved resulting payment structure is substantively in accord with the requirements of the social security law. It is undisputed that the State twice submitted the proposed rules to the HHS, which approved the change. We need not delve into the deliberative process of the federal agency in giving the approval. *See Illinois Hospital,* 576 F.Supp. at 369. We do consider whether the resulting rules complied with the basic standard of rates "reasonable and adequate" to meet costs incurred by "efficiently and economically operated facilities". But, as noted, probing beyond this bottom line to the underlying rate-setting methodology is not required. *Coalition of Michigan Nursing Homes v. Dempsey,* 537 F.Supp. 451, 459 (D.D.Mich.1982).[7]

■ The appellants argue too narrowly that the change in one component of the overall payment, due to state budgetary constraints, rendered the resulting payment unreasonable and inadequate. To terminate or affect one component, even if only for reasons of budgetary consideration, does not automatically produce a noncompliant payment. It is the resulting overall payment which is evaluated for statutory compliance. *See Wisconsin v. Reivitz,* 733 F.2d 1226, 1233 (7th Cir.1984) (prior medicaid reimbursement rate is not, per se, the only reasonable and adequate rate); *accord Illinois Council on Long*

*Term Care v. Miller,* 579 F.Supp. 1140, 1147 (N.D.E.D.Ill.1983). Reasonableness has been characterized as a zone, not a pinpoint. *Reivitz,* 733 F.2d at 1233 (citing *Federal Power Commission v. Conway Corp.,* 426 U.S. 271, 96 S.Ct. 1999, 48 L.Ed. 2d 626 (1976)); *accord Friedman v. Perales,* 668 F.Supp. 216 (S.D.N.Y.1987). Here we construe it as a zone or range in which a State may consider the relevant factors and data and determine a valid reimbursement rate which is reasonable and adequate. The state must articulate "a rational connection between the facts found and the choice made." *Baltimore Gas,* 462 U.S. at 105, 103 S.Ct. at 2256.

The record demonstrates that the State considered the relevant factors and data so that a rational relationship exists between these elements and the conclusion that the incentive payment should be terminated. *Baltimore Gas,* 462 U.S. at 105, 103 S.Ct. at 2256; *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823; *Reivitz,* 733 F.2d at 1231; *California Hospital Ass'n v. Schweiker,* 559 F.Supp. 110, 116 (C.D.Cal.1982), *aff'd* 705 F.2d 466 (9th Cir.1983); *see also Mary Washington,* 635 F.Supp. at 898 (relevant factors to be considered for economy and efficiency standard). Here the DSS reviewed information on the entire range of Medicaid services which had to be covered under the State's appropriation for *all* Medicaid services. The documents show the DSS considered some forty (40) different options for cutting the program costs, including elimination or reduction of some services such as elective surgery, psychiatric services, payment for prescription drugs; closing the children's unit at the Ft. Logan facility, as well as the termination of the incentive allowance to nursing homes. III R. at 34; Plaintiff's Exh. 15. Insofar as quantifiable, the State computed its projected shortfall and available appropriations for the time periods involved.[8] This

---

7. The fact that appellants did not name the Secretary and HHS as defendants does not limit our review of the Colorado rule, as approved by the Secretary, for compliance with federal law. As the district court pointed out, "there exists no federal or state administrative forum to which plaintiffs can turn for consideration of their

claims." *Colorado Health,* 598 F.Supp. at 1406; *Illinois Hospital,* 576 F.Supp. at 369.

8. The appellants argue that the varying State estimates of the amount of the shortfall or lack of available appropriations indicate the failure of the State to comply with federal statutes and regulations. During the time periods involved

analysis by the State included consideration of the savings in Medicaid and General Fund appropriations, client and provider impact, comments on immediate and long term implications, and potential for success in implementation. Plaintiffs' Exh. 15; *see also* Exh. 11, 16, 22, 28.

The appellants' argument that state budgetary limits are an inappropriate factor has been rejected. *See Coalition of Michigan*, 537 F.Supp. at 463 and n. 41. The providers argue that the State is precluded from reducing payment "solely on the basis of budgetary appropriations." Conference Agreement, the Boren Amendment, § 9, OBRA of 1980, P.L. 96–499 (1980), 1980 U.S.Code Cong., & Ad.News 5526, 5944. States must accommodate the overlap and conflict among (1) the 1980 federal mandate to reduce Medicaid costs, (2) their own state law limitations on deficit spending, (3) the reality of shrinking state revenues, and (4) the history of reduced federal Medicaid funding subsequent to the Boren Amendment. The language, *supra*, and the strict interpretation urged by the appellants has been rejected by the courts which say it should "be taken with a grain of salt". *Coalition of Michigan*, 537 F.Supp. at 463. n. 41; *Reivitz*, 733 F.2d at 1236; (*see also Mary Washington*, 635 F.Supp. at 894 (states in "intractable" position where legislative intent to discourage reductions adversely affecting quality of care is concurrent with OBRA mandate to contain Medicaid costs). We concur in the district court's rejection of this argument.

■ States can consider their budgetary constraints as a factor in amending their medicaid payment method so long as the result complies with the federal requirement for a reasonable and adequate payment. *Reivitz*, 733 F.2d at 1236 (citing *Illinois Council*, 579 F.Supp. at 1148); *United Hospital Center, Inc. v. Richardson*, 757 F.2d 1445, 1450 (4th Cir.1985) (Secretary states that service provider may be subject to overall state revenue limit, if provider continues to receive reimburse-

ment in conformance with Medicaid statutes and regulations). The appellants' argument against state budgetary constraints is derived from *Alabama Nursing Home Association v. Harris*, 617 F.2d 388 (5th Cir.1980). However, because of the statutory changes, the Fifth Circuit has now recognized that budgetary constraints can be considered by states in determining the reimbursement to medicaid service providers. *Mississippi Hospital*, 701 F.2d at 518, 521.

Here the reimbursement rate represents the State's considered judgment of what rates will both reflect the actual costs incurred, and also allow the State to comply with its appropriation limitations. *See Coalition of Michigan*, 537 F.Supp. at 463. The State has considered more than just the amount of money to be saved. In fact, it formulated and reviewed multi-layered options so that fairness to the parties affected was considered. *See* Plaintiffs' Exhs. 11, 15, 16, 22 and 28. The resulting payment falls "within range of what could be considered reasonable and adequate," as Congress mandated. *Mary Washington*, 635 F.Supp. at 901 (quoting 48 Fed.Reg. 56049 (December 19, 1983)). The quantified data and descriptive analysis suffice as the appropriate data on the relevant factors; the appellees made a good faith examination of the impact of the options available. *Id.* at 899; *see* Plaintiffs' Exhs. 12, 17 through 21, 31 and those last cited above. The State is not statutorily required to produce the data and analysis of special studies which the appellants desire. *Cf. Mary Washington*, 635 F.Supp. at 897 (state not required to make *written* findings under federal regulations so long as it makes *necessary* findings which are reasonable).

■ The wide latitude given to the states under the Boren Amendment and OBRA extends to the mechanisms used to promote participation by efficiently and economically operated facilities. The pay-

---

in this action the shortfall estimates for all Medicaid services ranged from $13.9 million to $24 million. We find that appellants' contention that "quantified estimates" were imprecise

is unpersuasive as it is counter to "the essence of the Boren Amendment [which] was to reduce this very type of detailed oversight." *Coalition of Michigan*, 537 F.Supp. at 463.

ment of an incentive allowance for service providers who contain their costs below a specific standard or percentile is not required by the federal legislation nor by HSS regulations. The thrust of the 1980 amendment was to shift the federal concern away from the method used by each state to determine reimbursement to the quality of care while containing costs. *Nebraska Health,* 575 F.Supp. at 178 (quoting Senator Boren that the amendment would allow states to implement "budget-based and negotiated rates"). The states are not required to reimburse providers for costs they actually or even reasonably incur. *Wilmac Corp.,* 633 F.Supp. at 1007; *Friedman,* 668 F.Supp. at 223.[9]

The states can set a benchmark rate for efficient costs by establishing fixed ceilings or caps. *Friedman,* 668 F.Supp. at 223. Here it is the ninetieth percentile of allowable administration costs incurred by Colorado nursing homes participating in the state Medicaid plan. This ceiling is not proscribed by the federal legislation as a procedural or substantive result of the State's efforts to achieve statutory compliance.

The amending of the state Medicaid plan so as to remove the incentive allowance and provide only reimbursement limited by a ceiling does not remove the payment plan from federal compliance. *Coalition of Michigan,* 537 F.Supp. at 454, 459–460. The courts have found rates below the ninetieth percentile to be in compliance. *E.g., Id.* (eightieth percentile ceiling); *Mississippi Hospital,* 701 F.2d at 517–518 (eightieth percentile ceiling): *compare Nebraska Health Care Association v. Dunning,* CV 82–L–472, slip op. (D.C.Neb. July 4, 1984) [available on WESTLAW, 1984 WL 13987] (state plan was federally approved for payment at sixty-fifth percentile, but was no longer in compliance when state subsequently imposed pro rata cut). It is not necessary

that we determine what ceiling would be noncompliant so as to affect detrimentally the services provided to Medicaid patients. Here we find no basis to conclude that the ninetieth percentile ceiling, in and of itself, fails to meet the statutory requirements.

In view of the Congressional intent to move away from the costs-incurred as the basis for payment and to contain the costs of Medicaid, this Colorado ceiling based on the allowable costs incurred by providers is a reasonable and adequate payment and serves to promote efficiency and economy. Because favorable budgetary conditions previously allowed the State to include the incentive allowance based on allowable administration costs does not mean the State cannot respond to changing financial conditions while complying with state and federal law. The appellants would have the State and the courts give priority to a single component for service providers. This approach would disregard the needs of the significant population which qualifies for and relies on Medicaid services because of low income or indigency, *e.g.,* the elderly, children, pregnant women, psychiatric patients, disabled persons, etc. *See* Colo.Rev.Stat. § 26–4–103(2) (definition of categorically needy); § 26–4–105 (list of fifteen services provided under Medicaid).

We do not believe that the federal law requires the appellees to disregard responsibilities to the population served by Medicaid and the State's fiscal obligations under Colorado law. In the implementation of the repeated suspensions of the incentive allowance, the State reasonably conformed with the federal statutory requirements. The State's factual foundation and conclusions therefrom are rationally related. The evidence before us fails to reveal arbitrary and capricious actions. To the contrary, it demonstrates a responsive effort by the State to use appropriate facts

---

**9.** The appellants charge that the Colorado plan fails to meet federal requirements because it disregards the costs incurred because of a changing patient profile, that is, higher accuity patients who require more services when transferred from hospitals to nursing homes. Appellants' Opening Brief at 28. If such a change in patient population and concomitant needs

should be specifically addressed in a state's reimbursement rate, then the Secretary is the one to so determine. *Illinois Council,* 579 F.Supp. at 1150; *see also Mary Washington,* 635 F.Supp. at 896–901 (court exercises its discretion in equity to decline to determine if new and necessary services should be included in state's reimbursement rate).

and rationale to cope with the various needs of Medicaid patients in the face of increasing costs and limited state revenues. Accordingly, we sustain the district court's determination that the appellees complied with the federal statutes and regulations governing Medicaid payments to nursing home operators.

## IV

## State Law Requirements

### A. *CAPA record requirements*

The appellants charge that in enacting the amended rules, the State acted without a certified administrative record and a statement of basis and purpose as required by CAPA, the Colorado Administrative Procedures Act, and, that DSS, as an agency, lacked the statutory authority to enact the emergency regulations to cease the payment of the incentive allowance. Furthermore they say that the record before us is incomplete.

▆▆▆▆ The lack of a certified administrative record or statement of basis and purpose as the foundation for noncompliance with CAPA was not raised below. We nevertheless have considered the claim and find that it lacks merit. Colorado law allows the parties to stipulate to less than the record specified under § 24–4–106(6) of the CAPA.[10] The parties entered a stipulation for consolidation under Rule 65(a)(2), Fed.R.Civ.P., which stated that "it is specifically understood that the Court shall consider the evidence previously received which would be admissible upon a trial on the merits, as well as any pleadings, filings or other documents which otherwise form part of the record and that the same shall

be considered during the Court's ruling upon this matter." *See* I R. 127–128; 133–134 at ¶ 5. The argument that the stipulations cannot excuse the State from the requirements of CAPA is untenable since the language of the statute clearly provides that parties can stipulate to less than the record described in § 24–4–106(6). *Id., see Harris v. District Court, Second Judicial District,* 655 P.2d 398, 401 (Colo.1982) (court did not have discretion to deny a motion to supplement record where the parties had not stipulated to a record less than that required under § 24–4–106(6)).

In any event, what was in the stipulated record shows ample justification for the State's action. After the Governor vetoed the incentive payment monies in S.B. 401, the DSS submitted its emergency rule to the legislative drafting office, in accordance with § 24–4–103(8)(d).[11] *See* II R. 252–264. This submission included the required fiscal impact statement and a statement of basis and purpose. *Id.* at 253, 255. These documents, and the other materials before the court do not leave us to guess at the reasoning process of the agency. The statement of basis and purpose reveals and explains the perceived necessity for the rule: the foreseeable shortfall in the Medicaid funds. *Citizens,* 649 P.2d at 1062.

The agency provides a foundation in fact for the resulting emergency regulation. *Id.* Here the more relevant facts are fiscal calculations, which the State has provided. The State has repeatedly articulated that if cutbacks were not implemented in the Medicaid budget, then Medicaid patients would suffer cutbacks or a total loss of services.[12] If the state did not provide the

---

10. Colo.Rev.Stat. 24–4–106(6) provides:

(6) In every case of agency action, *the record on review, unless otherwise stipulated by the parties,* shall include the original or certified copies of all pleadings, applications, evidence, exhibits, and other papers presented to or considered by the agency, rulings upon exceptions, and the decision, findings, and action of the agency. As to alleged errors, omissions, and irregularities in the agency record, evidence may be taken independently by the court. (emphasis added)

11. The evidence submitted to the court does not include materials provided to the legislative drafting office for subsequent emergency rules.

12. *See Emergency Justification,* II R. at 256 ("If such cutbacks were not implemented, there is the risk that all Medicaid recipients might be denied all services for a period of time. This is an unacceptable option to the department as it is not in the public interest."); Emergency Justification, Plaintiffs' Exhibit 1 at 2 ("... without such cost saving measures some Medicaid benefits will be discontinued before the end of the 1983 fiscal year.")

services required by the federal statutes it would suffer the sanction of denial of federal funds which would further curtail the services to medicaid patients.[13] The State has detailed the cuts, even to their specific effect upon individual service providers. *See* II R. at 253–262.

As emergency, informal rulemaking, the procedures followed by DSS were reasonable. The appellants were given notice via newspapers, oral contact, and the copies of the proposed rules. III R. 84–85. They were not precluded from submitting materials at these hearings or during the course of litigation. The amended rules which were enacted are supported by the facts in the record, the requisite for informal rulemaking. *Citizens*, 649 P.2d at 1063 (citations omitted); *see also Colorado Auto & Truck Wreckers v. Dept. of Revenue*, 618 P.2d 646, 652 (Colo.1980) (department proposing a regulation has no affirmative duty to offer evidence in support of it so long as proposed regulation is part of the record).

As the district court found, the amended rules are also valid as a policy judgment. *Colorado Health*, 598 F.Supp. at 1409; *see* Plaintiffs' Exh. 8, Governor Lamm's Veto statement: "It is inappropriate to pay last year's nursing home incentive when medical services are being limited because of financial constraints." At best, the appellants raise technical flaws which do not affect substantial rights. *Colorado Health*, 598 F.Supp. at 1408. When viewed in the light of the materials considered by DSS and the CBSS, and the breadth and judgmental or predictive nature of the policy choice inherent in the decision to suspend payment of the incentive allowance, the resulting rules were not in violation of Colorado law. *Citizens*, 649 P.2d at 1064–65 and n. 8 (citing *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978) and *FPC v. Transcontinental Gas Pipe Line Corp.*, 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961)).

### B. *DSS statutory authority*

Appellants say that the DSS and its board, the CBSS, lacked statutory authority to enact emergency rules amending the Medicaid payment plan pursuant to the appellees' interpretation of the statutory language that the incentive allowance is to be paid "subject to available appropriations."

In analyzing the authority delegated to the agency we consider the intent and language of the Colorado Medicaid Act, § 26–4–101 et seq. The Act directs that in cooperation with the federal government, the necessary medical and remedial care and services be provided for persons who are "categorically needy" as contemplated by the provisions of Titles IV, XVI, and XIX of the Social Security Act. §§ 26–4–102, 26–4–103(2). The Colorado DSS is the designated agency of the State for administering the program. § 26–4–104. *See* Colo.Rev.Stat. §§ 26–1–102–109 (promotion of the public health and welfare of the people of Colorado to be achieved through rules and regulations promulgated by the State department's board, the CBSS). Under the Medicaid Act the delegation to DSS is explicit:

> The state department, by rules and regulations, shall establish a program of medical assistance to provide necessary medical care for the categorically needy. The state department is hereby designated as *the single state agency* to administer such program in accordance with Title XIX and this article (emphasis added).

§ 26–4–104. Any actions of the DSS must be within the scope of this authority.

Statutes must be construed so as to effectuate their intent and beneficial purposes, not to defeat them. *See, e.g., Ingram v. Cooper*, 698 P.2d 1314, 1315 (Colo.1985); *Colorado Dept. of Social Services v. Board of County Commissioners*, 697 P.2d 1, 18 (Colo.1985); *Industrial Commission v. Board of County Commissioners*, 690 P.2d 839, 844 (Colo.1984). By

---

13. *See* Summary of Medicaid Shortfall and Interventions to Mitigate the Shortfall, Plaintiffs' Exhibit 11 and Letter from R. Valdez to L. White and G. Mitchell, re: anticipated overex-

penditure of Medicaid budget, Plaintiffs' Exhibit 22 (failure to provide federally required services would result in sanctions).

their language, subject matter and inclusion in the same code, the organic statute for DSS and the Medicaid Act must be read *in pari materia.* *See Allen v. Charnes,* 674 P.2d 378 (Colo.1984). Here a comprehensive regulatory scheme was envisioned by the General Assembly. *Colorado Dept. of Social Services,* 697 P.2d at 16. It intended that the scheme be administered to conform to the concomitant federal enactment. The state and federal statutes should be construed together so as to maintain institutional harmony. *Industrial Commission,* 690 P.2d at 844 (citations omitted).

The authority for promulgating and administering regulations is explicitly delegated to DSS and its board, CBSS. Colo. Rev.Stat. § 26–4–110(5)(c). (The CBSS shall, *subject to available appropriations,* adopt rules and regulations to determine and pay Medicaid providers whose actual administration costs are less than authorized reasonable costs.) Given the charge to protect the public safety and welfare and the forseeable shortfall in state monies which provide Medicaid services, the DSS and its board were not acting beyond the delegated authority when the emergency rules were enacted. As noted earlier, DSS was faced with a legal obligation to provide services to the categorically needy while the appropriated funds for this task were inadequate for the demands to be met during each of the fiscal periods involved. The emergency rules and regulations were appropriate as they were based on considerations directly related to the promotion of public safety and welfare and explicitly on the subject matter of the Medicaid Act as well as within the authority delegated to the DSS in the Medicaid Act. *Citizens,* 649 P.2d at 1065. The DSS actions clearly furthered the express purpose of the Medicaid Act. *Id.* The continued payment of the incentive allowance and other Medicaid components which were curtailed would have brought consequences in conflict with the intent of the Act, e.g., the loss of services to the categorically needy and possible federal sanctions for failure to provide federally required services.

We are not persuaded by the appellants' argument that the appellees were required to spend all the Medicaid appropriations until they received a forthcoming appropriation or before they could make the finding underlying the emergency rule that a funding shortfall existed. To hold as the appellants argue would bring an absurd result. *Ingram,* 698 P.2d at 1315; *Colorado Dept.,* 697 P.2d at 18. We hold that the appellees' emergency rulemaking was within the authority of the DSS and that it acted in accordance with the CAPA and the Medicaid Act.

**V**

The Claim Under Contract Law

The appellees are charged with having failed to make payments "earned" under the contract between nursing home providers and the State. To the extent that appellants enjoy contractual rights, they are defined by the state's compliance with federal law pertaining to medicaid reimbursement. *Massachusetts General Hospital v. Weiner,* 569 F.2d 1156, 1161 (1st Cir.1978); *see Reivitz,* 733 F.2d at 1232–1233. Where the State is found to be in conformity with federal requirements, the appellants lack a basis for contractual claims. *Illinois Council,* 579 F.Supp. at 1148–1149.

As a potentially independent basis for entitlement, the contract here between the service providers and the State does not include the incentive allowance as a specific component of the appellants' compensation. The appellants agreed to be bound by state and federal regulations, which specifically are addressed in the contract as a changeable condition.[14] The appellants agreed to perform their duties and obligations "in conformance with ... all pertinent regulations ... in effect as of the date of the

14. Appellants' Exh. 24, Contract, states:
   6. Payment Rate
      (a) Contractor shall be reimbursed by the Department in such amounts as may from time to time be set by the Colorado Department of Social Services pursuant to the Medicaid statute, the Colorado Medical Assistance Act, and the rules and regulations promulgated thereunder.

contract, or as they may later be amended." Plaintiffs' Exh. 24: Contract at ¶ 1. The appellants were unambiguously on notice that they were contracting to a prospective variable payment rate.

The appellees' compliance with the federal statutes and the specific language of the contract demonstrate there was no denial of compensation which was earned. The Social Security Act does not require payment of the incentive allowance. The contract fails to provide an alternative ground for entitlement to it. The incentive allowance is an option or add-on permissible under the state and federal law, but dependent upon the State's discretionary choice in how it constructs the Medicaid reimbursement plan. The district court properly rejected the contract claim.

## VI

Accordingly, for the reasons stated,[15] the judgment of dismissal is

AFFIRMED.

---

**15.** The State has sought to preserve its Eleventh Amendment objections as to retroactive relief in the event the judgment were reversed. We are instead affirming and need not address the issue.